**AIMCOR, ALABAMA SILICON, INC., and American Alloys, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**CVG–Venezolana de Ferrosilicio, C.A., Defendant–Intervenor.**

**Court No. 93–06–00322.**

United States Court of International Trade.

Dec. 13, 1994.

448

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

Plaintiffs, domestic manufacturers of ferrosilicon, move for judgment upon the agency record pursuant to USCIT R. 56.2, contesting certain parts of the final affirmative determination of the United States Department of Commerce. *Final Affirmative Countervailing Duty Determination: Ferrosilicon From Venezuela; and Countervailing Duty Order for Certain Ferrosilicon From Venezuela,* 58 Fed.Reg. 27,539, *amended by* 58 Fed.Reg. 36,394 (Dep't Comm.1993). The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

Plaintiffs filed a countervailing duty petition alleging, *inter alia,* that Defendant–Intervenor, CVG–VENEZOLANA de FERRO-SILICIO, C.A., (FESILVEN), the sole Venezuelan producer and exporter of ferrosilicon, received countervailable subsidies in its ferrosilicon production and exports into this country. Commerce initiated a countervailing duty investigation for 1991. In its final determination, Commerce found FESILVEN received electricity at preferential rates, and estimated the antidumping duty rate at 22.08 percent *ad valorem.*[1] 58 Fed.Reg. at 27,542.

Plaintiffs allege Commerce failed to countervail against two capital infusions which conveyed subsidies to FESILVEN. According to plaintiffs, Commerce erred when it declined to (1) treat FESILVEN and its parent company as a single entity in examining whether the 1991 purchase of FESILVEN's stock by its parent company was a stock redemption; and (2) recognize that a new class of stock issued by FESILVEN and purchased entirely by Government-owned entities was rendered worthless by the attached restrictions, despite the fact that FESIL-

Baker & Botts, L.L.P., William D. Kramer, Charles M. Darling, IV and Clifford E. Stevens, Jr., Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice Cynthia B. Schultz, Thomas H. Fine, Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Rogers & Wells, Ryan Trainer, Washington, DC, for defendant-intervenor.

---

1. Commerce also determined that FESILVEN was receiving a countervailable subsidy through the Export Bond Program, and estimated the net bounty or grant to be 1.69 percent *ad valorem.* 58 Fed.Reg. at 27,540. However, the Export Bond Program was later revised to cover agricultural products only. Accordingly, Commerce amended its determination, adjusting the subsidy rate related to that program to zero. *Id.*

VEN was equity-worthy at the time of the issuance. Plaintiffs allege Commerce's failure to impose duties to countervail against these subsidies is not supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

In the investigation below, Commerce was required to determine whether FESILVEN received a bounty or grant within the meaning of 19 U.S.C. § 1303 (1988). Section 1303 requires the imposition of countervailing duties to offset the payment or bestowal of a bounty or grant "upon the manufacture or production or export of any article or merchandise." 19 U.S.C. § 1303(a)(1).

■ Once Commerce makes its final determination, the court's role is to uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

### 1. Stock Purchase by Parent Company

■ The first alleged subsidy arises from the purchase of FESILVEN's stock by Corporacion Venezolana de Guayana (CVG), a government-owned holding company that maintains an ownership interest in, and has responsibility for the general operation of, many different companies within Venezuela, including FESILVEN. Prior to 1991, a major portion of FESILVEN's stock was held by Fondo de Inversiones de Venezuela (FIV), a government-owned financial institution. In 1991, FIV sold all of its shares of stock in FESILVEN and various other companies to CVG, on favorable credit terms and at a price slightly higher than par value. FIV's right to unpaid 1990 and 1991 cumulative, preferred dividends on the stock was also transferred.

Plaintiffs argue that CVG's purchase of FESILVEN's stock from FIV was the culmination of a plan to infuse money into FESILVEN, and therefore was properly viewed as a stock redemption which resulted in a benefit to FESILVEN. Plaintiffs do not contend that the transfer constituted a *de jure* redemption, as the shares are still outstanding and are not represented as treasury stock. Rather, due to the close relationship between FESILVEN and CVG, plaintiffs argue that the purchase was a *de facto* stock redemption. According to plaintiffs, this transaction conferred two countervailable benefits upon FESILVEN: (1) the difference between par value of the transferred shares and the amount paid by CVG in 1991;[2] and (2) the past due dividend obligation which they allege was canceled upon the transfer.

Commerce found CVG's purchase of FESILVEN's stock did not result in a bounty or grant because no benefit inured to FESILVEN in the transaction. Commerce rejected plaintiffs' argument that the extensive relationship between CVG and FESILVEN mandated that CVG's purchase of FESILVEN's stock be viewed as stock redemption. Instead, Commerce found an insufficient identity of interests to warrant treating CVG and FESILVEN as a single entity. *Final Determination*, 58 Fed.Reg. at 27,541–42. Commerce pointed out that, although CVG exercised extensive control over FESILVEN, FESILVEN had other shareholders. *Id.* In addition, Commerce noted, CVG is "merely a holding company with ownership interests in other companies producing other products." *Id.* Finally, Commerce determined that the transfer of shares to CVG did not relieve FESILVEN of its dividend obligations. *Id.*

Section § 1303 governs where, as here, the country exporting the subject merchandise is not a country under the Agreement on Subsidies and Countervailing Measures within the

2. Par value of the transferred shares was US $12,071,730. The transfer price was US $15,-259,095. The purchase price was to be paid out over 40 years at an interest rate of 0.5 percent per annum. Applying the Bank of Venezuela discount rate of 43 percent in August of 1991, plaintiffs calculate the transfer price to be 8 percent of par value. (Pls.' Br., at 9–10.)

meaning of 19 U.S.C. § 1671(b) (1988). Section 1303 provides, in pertinent part:

### § 1303. Countervailing Duties

### (a) Levy of countervailing duties

(1) [W]henever any country ... partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ..., then upon the importation of such article or merchandise into the United States ..., there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

19 U.S.C. § 1303(a)(1).

■ Therefore, in order for Commerce to find a countervailable benefit within the meaning of section 1303, two conditions must be met. First, Commerce must find that a "bounty or grant" has been bestowed, directly or indirectly. Second, the bounty or grant must have been bestowed "upon the manufacture or production or export" of the subject merchandise. Thus, even if a benefit was directly or indirectly bestowed, plaintiffs must demonstrate that it went to the manufacture, production, or export of the merchandise in question. Plaintiffs fail to met either prong of this test.

Plaintiffs argue that Commerce's critical error was in failing to treat FESILVEN and CVG as a single entity, and that such treatment would reveal a benefit to FESILVEN. The court agrees that, if Commerce was incorrect in treating the two companies separately, any benefit to CVG may be attributable to FESILVEN. On the other hand, if Commerce properly treated the two companies separately, then, due to the lack of evidence to the contrary, the court must find that no "bounty or grant" resulted from the transfer.

Plaintiffs argue that the level of control exercised by CVG over FESILVEN requires Commerce to treat CVG and FESILVEN as a single entity. Plaintiffs stress that CVG exercises the right to choose members of FESILVEN's Board of Directors, deter-

mines the compensation CVG receives for the management services it provides, and controls the budget, plans, and programs. These arguments are unpersuasive. That CVG exercised some control over FESILVEN does not necessarily indicate that the benefit to CVG passed through to FESILVEN. Moreover, there is no indication that the benefit went to manufacture, production or export of the merchandise.

■ Plaintiffs further allege that prior precedent binds Commerce to treat CVG and FESILVEN as a single entity. Plaintiffs rely on *Armco Inc. v. United States*, 14 CIT 211, 733 F.Supp. 1514 (1990) for this proposition. In *Armco*, the producer of the subject merchandise, a wholly-owned subsidiary of the parent company, received a countervailable benefit. Thereafter, the subsidiary passed exportation of merchandise produced under that subsidy to the parent company. *Armco*, 14 CIT at 213, 733 F.Supp. at 1516. This court held that Commerce improperly allowed the merchandise to escape a countervailing duty, stating that such duty is not avoided "merely because there is no evidence that the subsidiary itself overtly transfer[red] to the parent any specific subsidy benefits received." *Armco*, 14 CIT at 225, 733 F.Supp. at 1525. The court reasoned "[t]he benefit to the subsidiary accrues immediately to the parent corporation (as an enhancement of its asset, the subsidiary), and the benefit is presumably reflected in the parent corporation's consolidated financial statements." *Armco*, 14 CIT at 218, 733 F.Supp. at 1520.

Plaintiffs now seek to extend the court's decision in *Armco* to require Commerce to treat parent and subsidiary corporations as one entity in those instances where consolidated financial statements are filed. Plaintiffs misconstrue the holding in *Armco*. The *Armco* court did not base its decision on the relationship of the parent and the subsidiary, or on the consolidation of their financial statements. Instead, the court determined that a duty must be imposed because the countervailable benefit to the subsidiary reached the subject merchandise exported by the parent company. *Armco*, 14 CIT at 224, 733 F.Supp. at 1524. Thus, *Armco* stands

## 452

for a contrary proposition: it confirms that Commerce is required to examine simply more than the corporate structure in deciding whether a countervailable benefit has been bestowed within the meaning of section 1303.

Moreover, the court also distinguishes *Armco* upon the differing relationships between the parties involved. In *Armco*, a benefit to the subsidiary resulted in an enhancement of the parent, because the subsidiary was an asset of the parent. Although the parent company may necessarily benefit from the enhancement of one of its assets, the converse is not true: a benefit to the parent corporation, as here, does not necessarily make one of its assets, such as its subsidiary, more valuable.

Plaintiffs also rely on *Final Affirmative Countervailing Duty Determination: Brass Sheet and Strip From France*, 52 Fed.Reg. 1218 (Dep't Comm.1987), wherein Commerce treated funds transferred by a nationalized holding company to its subsidiary as a countervailable subsidy. In *Brass Sheet*, the parent company, Pechiney, was a holding company primarily owned by the French government. *Id.* at 1220. Pechiney provided equity infusions and other financial assistance to its subsidiary, Trefimetaux, the exporter of the subject merchandise. *Id.* at 1220–21. Commerce treated the equity infusions by Pechiney as a countervailable subsidy, finding that the parent company's direct infusion of money into the subsidiary reached the exported merchandise. *Id.* at 1220.

Unlike in *Brass Sheet*, there is no record evidence that any benefit conferred upon CVG passed through FESILVEN to the exported merchandise. *Brass Sheet*, like *Armco*, illustrates that Commerce does more than simply look at the relationship between the parties. Instead, *Brass Sheet* demonstrates Commerce's consistent, statutorily mandated, policy of tracing a bounty or grant to determine whether it reached the exported merchandise before Commerce imposes a duty. *Brass Sheet*, 52 Fed.Reg. at 1220; *See also Final Affirmative Countervailing Duty Determination; Operators for Jalousie and Awning Windows From El Salvador*, 51 Fed.Reg. 41,516, 41,519 (Dep't Comm.1986)

(stating that one primary concern in related party transactions is whether benefits are being passed through from one company to another); *Final Affirmative Countervailing Duty Determination: Carbon Steel Structural Shapes From Luxembourg*, 47 Fed.Reg. 39,364, 39,365 (Dep't Comm.1982) (treating related companies that received different subsidies separately to ensure that assessed duty corresponds to actual distribution of countervailable benefits). Absent a showing that the subsidy reached the exported merchandise, this court will not disturb Commerce's determination.

■ Plaintiffs also argue that the Commerce is required to treat CVG and FESILVEN as a consolidated entity because such treatment is in accordance with Generally Accepted Accounting Principles (GAAP). GAAP requires a parent corporation owning more than 50 percent of the voting shares of its subsidiary to file consolidated financial statements with its subsidiary. Plaintiffs argue that the consistent application of these principles in the disciplines of tax and accounting would make Commerce's failure to use GAAP in the present case unreasonable.

■ Plaintiffs can provide no authority requiring Commerce to consistently apply GAAP in all aspects of countervailing duty investigations. Moreover, even if Commerce established a practice of applying GAAP in this circumstance in the past, it appears that the Federal Circuit may permit Commerce broad discretion to change its methodology without requiring Commerce to provide a rationale for that change. *See Allied–Signal Aerospace Co. v. United States*, 12 Fed.Cir. (T) ——, ——, 28 F.3d 1188, 1191 (1994) (noting that *de facto* BIA policy may not necessarily bind Commerce in future BIA determinations).

Furthermore, mere reliance on GAAP, without focusing on whether a benefit to a related company reaches the subject merchandise, would not enable Commerce to carry out its statutory mandate. Instead, this proposal would result in the imposition of a countervailing duty based upon speculation that a benefit reached the subject merchandise. Therefore, the court finds that Com-

merce is not required to apply GAAP in this context.

◼ Finally, plaintiffs refer the court to the companion antidumping investigation, wherein Commerce treated FESILVEN, CVG and CVG-owned related suppliers as a single entity in its cost of production analysis. Plaintiffs argue that Commerce's treatment of CVG and FESILVEN as a consolidated entity in the companion antidumping investigation requires Commerce to treat the two companies as a single entity in the countervailing duty investigation.

Although both antidumping and countervailing duty laws are designed to counter unfairly-traded imports, and similarities exist between the two types of investigations, these laws are directed at different types of unfair trade practices and concern different issues. *Aimcor v. United States,* 18 CIT ——, ——, Slip Op. 94–192 at 5–6 (Dec. 13, 1994). In the antidumping context, Commerce must determine whether the merchandise that is the subject of the investigation is being sold in the United States at less than its fair market value. 19 U.S.C. § 1673(1) (1988). To calculate fair market value, Commerce must decide how to treat related parties in a variety of contexts; Commerce applies different tests to related parties, depending upon the focus of the inquiry. *Aimcor,* 18 CIT at —— – ——, Slip Op. 94–192 at 6–8. In the companion investigation, where Commerce was seeking to calculate the true cost of producing the subject merchandise, *see* 19 U.S.C. § 1677b(b) (1988), Commerce treated CVG and FESILVEN as a single entity for the limited purpose of calculating cost of production. *Aimcor,* 18 CIT at ——, Slip Op. 94–192 at 3.

In contrast, Commerce's focus in an antidumping investigation is to ascertain whether a bounty or grant has been bestowed, directly or indirectly, "upon the manufacture or production or export of any article or merchandise manufactured or produced" in the exporting country. 19 U.S.C. § 1303(a)(1). Commerce's inquiry, therefore, must center on whether a government subsidy has affected the manufacture, production, or export of the subject merchandise. In this context, automatically treating related companies as a single entity would not permit Commerce to answer the statutory mandate. Because the question at issue differs in the two types of investigations, Commerce is not bound in this determination by its treatment in the antidumping determination of FESILVEN and CVG.

Plaintiffs fail to bring to the court's attention record evidence demonstrating a benefit, whether direct or indirect, flowing to FESILVEN. Therefore, this court must affirm Commerce's determination that CVG's purchase of FESILVEN's stock did not result in a countervailable benefit to FESILVEN.

## 2. Issuance of Class "E" Stock

◼ The second alleged subsidy arises from the purchase, exclusively by government-owned entities, of a new class of stock issued by FESILVEN. In addition to a bounty or a grant, a subsidy also includes "[t]he provision of capital ... on terms inconsistent with commercial considerations." 19 U.S.C. § 1677(5)(A)(ii)(I). Plaintiffs argue that the restrictions the new class of stock, designated Class "E" stock, rendered the stock worthless, converting the purchase into either a pure grant, or a transaction on terms inconsistent with commercial considerations within the meaning of section 1677(5)(A)(ii)(I).

In December of 1991, following a revaluation, FESILVEN issued Class "E" stock. FESILVEN initially distributed the stock to existing shareholders. Thereafter, additional shares were offered for purchase. However, government-owned entities were the sole purchasers. The stock was subject to two primary restrictions: (1) it could not be sold for greater than par value; and (2) existing shareholders had the first right of purchase prior to any sale. The stock carried the same voting rights as existing classes of stock, and holders were eligible for dividends after FELSILVIN satisfied all outstanding cumulative dividend obligations on pre-existing classes of stock.

Plaintiffs point out that the restriction on sale above par value, taken in the context of a Venezuelan inflation rate exceeding 30 percent per year, would result in a loss of ap-

454

proximately 50 percent of the investment's original value within two years. Moreover, according to plaintiffs, dividends would not make up for the loss, as FESILVEN has failed to issue dividends for years, and already holds an outstanding dividend obligation in the millions of dollars.

According to the Government, in the absence of a market-determined price for stock, to ascertain whether a purchase was inconsistent with commercial considerations, Commerce must determine whether or not the company issuing the stock was equity-worthy at the time the stock was issued. Commerce concluded that FESILVEN was equity-worthy at issuance. In its determination, Commerce found that the class "E" shares were not worthless, because "holders of class "E" shares have voting rights and are eligible for dividends." 58 Fed.Reg. at 27,542. Based on these findings, Commerce concluded the purchase of the class "E" shares was not on terms inconsistent with commercial considerations. *Id.*

■ The scope of Commerce's inquiry was not sufficient to enable Commerce to carry out its statutory mandate. In the case where a company is not equity-worthy, this limited inquiry is sufficient, because an infusion of capital into an unequity-worthy company would be inconsistent with commercial considerations. However where a company is equity-worthy, as here, it does not necessarily follow that the purchase of stock from that company will be consistent with commercial considerations. Commerce appears to establish a blanket rule that the stock issued by an equity-worthy company would be equity-worthy as well.

The court does not agree. Due to the restriction on the sales price of the class "E" shares, the sole avenue of return for those shares is from the future dividends. In analyzing the likelihood of a return based upon dividends, Commerce merely concluded that entitlement to the dividends exist. This, standing alone, does not permit Commerce to determine whether "the expected return [from the investment] is below that which would be required by a private investor." *Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic*

*Groundfish From Canada,* 51 Fed.Reg. 10,-041, 10,047–48 (Dep't Comm.1986). The court finds it difficult to imagine how the purchase of stock burdened by these onerous conditions could be anything other than inconsistent with commercial considerations.

The court recognizes the discretion afforded to Commerce in determining whether a subsidy exists. *PPG Indus., Inc. v. United States,* 9 Fed.Cir. (T) 71, 74, 928 F.2d 1568, 1572 (1991). However, "the Court must not permit an agency in the exercise of that discretion to ignore or frustrate the intent of Congress as expressed in substantive legislation that the agency is charged with administering." *Armco,* 14 CIT at 217, 733 F.Supp. at 1519. This court cannot, consistent with the intent of Congress, permit Commerce to base its decision in this matter solely upon the equity worthiness of the issuing company. Congressional intent, rather, dictated the imposition of countervailing duties to offset the provision of capital when made on terms inconsistent with commercial considerations.

The court holds that further consideration is required to determine whether the purchase of class "E" shares was inconsistent with commercial considerations. Therefore, the court remands the matter to Commerce for further findings, sufficient to determine whether the expected return on the investment is adequate to avoid the imposition of a countervailing duty.

## CONCLUSION

Commerce's final determination is affirmed in part and remanded in part. Commerce's determination that CVG's purchase of FESILVEN's stock from FIV did not constitute a subsidy is supported by substantial evidence in the record and is in accordance with law. However, Commerce's inquiry regarding the purchase of Class "E" stock by CVG is insufficient. Accordingly, the court remands the issue to Commerce for reconsideration.

Commerce is directed to file its remand determination within 60 days of the date of this opinion. Any comments on Commerce's

remand results shall be filed with the court within 45 days thereafter.