**GENEVA STEEL, AK Steel Corporation, Bethlehem Steel Corporation, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Inc., LTV Steel Company, Inc., LaClede Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group, a Unit of USX Corporation, and WCI Steel, Incorporated, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Fabrique de Fer de Charleroi, S.A., S.A. Forges de Clabecq, Sidmar N.V., and TradeARBED, Incorporated, Defendant–Intervenors.**

**Slip Op. 96–147.**
**Court No. 93–09–00566–CVD.**

United States Court of International Trade.

Aug. 27, 1996.

Dewey Ballantine (Alan W. Wolff, Michael H. Stein, Martha J. Talley, John A. Ragosta, Michael R. Geroe), Counsel for Geneva Steel, et al.; Barnes, Richardson & Colburn (Gunter von Conrad, Peter A. Martin), Counsel for Fabrique de Fer de Charleroi, S.A.; LeBoeuf, Lamb, Greene & MacRae (Melvin S. Schwechter, Barbara R. Newell), Counsel for S.A. Forges de Clabecq; O'Melveny & Myers (Gary N. Horlick, Peggy A. Clarke, Teresa

E. Dawson), Counsel for Sidmar N.V. and TradeARBED, Incorporated.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Velta A. Melnbrencis), Duane W. Layton, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

## OPINION

CARMAN, Judge:

Geneva Steel, AK Steel Corporation,[1] Bethlehem Steel Corporation, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, LTV Steel Company, Incorporated, Laclede Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestic Producers"), challenge that aspect of the Department of Commerce's ("Department" or "Commerce") *Redetermination on Remand, Final Countervailng* [sic] *Duty Determinations, Certain Steel Products From Belgium* (dated May 10, 1996) (*Redetermination* ) concerning Sidmar N.V.'s (Sidmar) preferred shares. The Court has retained jurisdiction during the pendency of this action. 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

On July 9, 1993, Commerce published the final results of its countervailing duty investigation of several Belgian steel companies. *Certain Steel Products From Belgium,* 58 Fed.Reg. 37,273 (Dep't Comm.1993) (final determ.), *amended by Certain Steel Products From Belgium,* 58 Fed.Reg. 43,749 (Dep't Comm.1993) (order and amend. to final determ.) (*Final Determination* ). The Belgian steel firms investigated were Fabrique de Fer de Charleroi, S.A. (Fabfer), S.A. Cockerill Sambre (Cockerill), S.A. Forges de Clabecq (Clabecq), and Sidmar.

Plaintiffs in the consolidated action, Domestic Producers and Fabfer, each filed motions for judgment upon the agency record pursuant to U.S. CIT R. 56.2 contesting the *Final Determination.* Defendant–Intervenors Sidmar and Clabecq filed response briefs in opposition to Domestic Producers' motion. After consideration of plaintiffs' arguments and the responses thereto, the Court sustained in part and remanded in part the *Final Determination. Geneva Steel v. United States,* 914 F.Supp. 563, 620 (CIT 1996). The Court's remand instructions ordered Commerce to

> determine whether Cockerill's and Clabecq's common shares were "next most similar publicly traded equity instrument" after the parts bénéficiaries and indicate the record evidence the agency relied upon in reaching its determination; . . .
>
> determine whether Sidmar's conversion of OCPCs to parts bénéficiaires was on terms inconsistent with commercial considerations and indicate the record evidence the agency relied upon in reaching its determination; . . . .
>
> recalculate the countervailing duty rate for the conversions of BF 211,835,100 and BF 1.288 billion Clabecq debt held by the Société Nationale pour des Reconstruction des Secteurs Nationaux to ordinary and non-voting preference shares, pursuant to the approval of the Belgian Council of Ministers on December 30, 1983, based on the date of the Government of Belgium's equity infusion; . . . .
>
> recalculate the countervailing duty rate for the loan received by Clabecq, which was outstanding as of June 30, 1991, to include the interest rate reduction, resulting from interest rebates, under the Gandois Plan; . . . .
>
> determine whether Sidmar's redemption of preferred shares was on terms inconsistent with commercial considerations and indicate the record evidence the agency relied upon in reaching its determination; . . . .
>
> determine whether the Government of Belgium funding of additional allowance

---

1. At the time the complaint was filed, AK Steel Corporation was named Armco Steel Company, L.P.

benefits under the Steel CLC bestowed recurring benefits and indicate the record evidence the agency relied upon in reaching its determination; . . . .

*Id.* at 620 (order).

## STANDARD OF REVIEW

The standard for this Court's review of a remand determination by Commerce is whether that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)).

## DISCUSSION

A. *Basis for Selecting Common Shares as Benchmark for Clabecq's and Cockerill's Parts Bénéficiaires (PBs)*

Commerce explains that the basis for selecting common shares as the next most similar form of publicly traded equity in the case of Clabecq is the "history of the share capital of the company from its incorporation in October 1888 through November 1987." *Redetermination* at 13–14. Commerce found evidence that:

> During the period when PBs were issued, December 3, 1985 through August 13, 1987, Clabecq's capital consisted of 600,000 common shares ... and 390,353 non-voting preference shares. The non-voting preference shares were not publicly traded. The only shares which were publicly traded were Clabecq's common shares, which were traded on the Brussels stock exchange.

*Id.* at 14 (citations omitted). Accordingly, Commerce used Clabecq's common shares as the next most similar publicly traded shares for purposes of selecting a benchmark to measure the benefit of the conversion of obligations convertibles participantes et conditionnelles (OCPCs) into PBs.

In the case of Cockerill, Commerce points to Cockerill's annual reports from 1977 through 1991 and the Government of Belgium (GOB) questionnaire response as evidence "that Cockerill had only common shares outstanding when its OCPCs were converted into PBs in 1985." *Id.* Commerce

notes Cockerill's 1985 annual report indicates only one type of share—common shares. Furthermore, the GOB response refers to only common shares and PBs in its discussion of dividends, indicating to Commerce preference shares did not exist. Taken together, this evidence led Commerce to conclude Cockerill's common shares were the next most similar publicly traded shares for purposes of selecting a benchmark to measure the benefit, if any, from the GOB's purchase of Cockerill's PBs.

B. *Conversion of Sidmar's OCPCs to PBs*

Commerce describes the conversion of Sidmar's OCPCs to PBs as follows:

> During the period 1979 through 1983, the GOB assumed the interest costs on Sidmar's medium- and long-term loans taken out prior to 1979. In exchange, Sidmar conditionally issued debt instruments known as OCPCs to the GOB in the amount of the interest assumed. On July 15, 1985, the GOB and Sidmar agreed to convert OCPCs into equity instruments known as PBs.

*Id.* at 6 (citations omitted). To determine whether an equity infusion is made on terms inconsistent with commercial considerations, Commerce explains it normally "compar[es] the price per share paid by the government to the price per share paid by a private investor participating in the same share issuance." *Id.* at 7 (citation omitted). If no private investor participated in the share issuance, Commerce utilizes the price of publicly traded shares as a benchmark. *See Geneva Steel,* 914 F.Supp. at 571 (describing Commerce's practice of measuring countervailable benefits from government equity infusions).

Because no private investors subscribed to Sidmar's PBs, and because none of Sidmar's shares are publicly traded, Commerce had none of the usual benchmarks by which to determine whether the GOB's equity infusion was on terms inconsistent with commercial considerations. Therefore, Commerce relies on an April 1984 report prepared by the Belgian affiliate of Arthur Young (now Ernst & Young) to derive the value of Sidmar's

common shares and thereby determine the appropriate benchmark value.

Commerce explains that "[b]efore comparing the value of a common share ... with the price paid by the GOB for PBs, we have compared the principal characteristics of Sidmar's common shares and PBs. Specifically, we compared (1) dividend rights, (2) transferability, and (3) voting rights." *Redetermination* at 9. After examining the characteristics of common shares and PBs, Commerce determines, "it is evident that Sidmar's PBs are inferior to its common shares." *Id.* Because Commerce also finds Sidmar's PBs were less valuable than its common shares, the agency adjusted the benchmark price of the common shares to be used in valuing the PBs.[2] When comparing the price the GOB paid for the PBs to the adjusted benchmark price of the common shares, Commerce concludes the GOB's purchase of PBs was on terms inconsistent with commercial considerations and resulted in a countervailable subsidy.

### C. Clabecq's Common Share Price on Date of Equity Infusion

In accordance with the Court's remand instructions, Commerce recalculated the benefit bestowed by the GOB's purchase of Clabecq's common and non-voting preferred shares based on the market price of Clabecq's common shares on May 23, 1985—the date of the debt-to-equity conversion. After comparing the trading price of common shares on day of the conversion to the price the GOB paid for Clabecq's common and non-voting preferred shares, Commerce concluded the GOB paid "more per share than the market price of Clabecq's common shares." *Id.* at 4 (citations omitted). Commerce explains it applied its grant methodology to the overall premium to generate a countervailable subsidy rate for Clabecq.

### D. Interest Subsidy to Clabecq

Commerce explains that in accordance with the Court's instructions, it has recalculated the benefit from a loan Clabecq received from the Societe Nationale de Credit a l'Industrie, a public credit institution, taking into account the interest rate reduction applied to that loan. *Id.* at 5. Commerce then calculated the total benefit of the interest reduction during the period of investigation and the resulting countervailing duty rate.

### E. Additional Allowance Benefits Under the Steel Collective Labor Convention as Recurring Benefits

In 1978, Belgian steel companies negotiated a collective labor convention (the Steel CLC) in light of the massive restructuring in the steel industry and the large numbers of workers affected. *Geneva Steel,* 914 F.Supp. at 610. Commerce found the Steel CLC conferred a countervailable benefit because, in part, it relieved steel companies of their obligation to pay an additional allowance over and above GOB unemployment benefits that the companies were otherwise required to pay certain laid-off workers. This Court remanded to Commerce for an explanation of evidence Commerce relied upon in determining the GOB's funding of the additional allowance benefits under the Steel CLC bestowed recurring benefits.

In the *Redetermination,* Commerce explains that to determine whether a benefit is recurring, "Commerce considers whether the recipient can expect to receive the benefit on an ongoing basis from review period to review period and/or whether provision of funds by the government need not be approved every year." *Redetermination* at 28 (citation omitted). In this case, Commerce found that when negotiating a collective labor convention, steel firms

were automatically granted derogations with regard to minimum age, reduction of the notice period, and hiring of replacement workers.... Moreover, they were automatically qualified to realize the benefits from the pre-pensioning, including re-

---

**2.** For example, after accounting for the difference in the dividend structures of PBs and common shares, Commerce states it "would expect Sidmar's PBs to be valued at 17.5 percent of the value of a common share." *Redetermination* at

12. To account for the difference in voting rights between PBs and common shares, Commerce discounts the benchmark price of PBs by 3 percent.

imbursements from the GOB for additional allowance payments to the separated workers.

In some cases, the additional allowance payments and subsequent reimbursements could be made for a period of up to 15 years. For example, a worker pre-pensioned at the age of 50 would receive payments until normal retirement at age 65. No additional government approvals were required during this time.

The benefits realized by the steel companies under the Steel CLC were ongoing benefits that were received from review period to review period. In the case of Fabfer ... benefits were received over a seven-year period—from 1984/85 through 1990/91 (with the exception of 1986/87). For Clabecq, benefits were received over the 13-year period 1980 through 1992.

*Id.* at 28–29 (citations omitted). Commerce therefore concluded the additional allowance payments "were ongoing payments that the companies received from review period to review period without the need for successive applications and approvals of benefits." *Id.* at 29.

Neither Domestic Producers nor defendant-intervenors challenge any of the aspects of the *Redetermination* discussed above. Accordingly, after review of the *Redetermination* and the evidence underlying Commerce's analysis, the Court holds these aspects of the *Redetermination* are based on substantial evidence and are otherwise in accordance with law.

### F. *The Redemption of Sidmar's Preferred Shares*

#### 1. Background

In 1984, the GOB made two share subscriptions in Sidmar: the first involved the purchase of ordinary shares and the second consisted of the purchase of preferred or preference shares issued in return for the cancellation of certain debt claims held by the SNSN—the GOB agency purchasing the shares—against Sidmar. In 1987, Sidmar redeemed the preference shares:

"[T]he GOB requested that Sidmar redeem the preference shares early for budgetary reasons. Therefore, in 1989, Sidmar and the GOB agreed to fix the amount due in the year 2004. However, in order to receive some money back immediately, the GOB asked Sidmar to pay the net present value in 1991 for the total due in 2004."

*Geneva Steel,* 914 F.Supp. at 600 (quoting *Final Determination,* 58 Fed.Reg. at 37,278). Domestic Producers argued in *Geneva Steel* that Commerce erred in concluding Sidmar's redemption of the preferred shares in 1991 did not give rise to a countervailable benefit. With respect to this argument, the Court ordered Commerce on remand to determine "whether Sidmar's redemption of preferred shares was on terms inconsistent with commercial considerations and indicate the record evidence the agency relied upon in reaching its determination." *Id.* at 620 (order).

#### 2. Commerce's *Redetermination*

To determine whether the redemption was on terms inconsistent with commercial considerations, Commerce examined whether the GOB accepted too low a price for the shares it sold back to Sidmar. If that were the case, Commerce explains, a benefit would have been conferred upon Sidmar. Because Commerce did not have a market-determined price for the shares to use as a benchmark for the redemption, the agency looked to the specific terms of the redemption.

[T]he GOB faced an uncertain outcome in 2004. First, if the Preferred Shares were redeemed, Sidmar was required to pay the [    ] Hence, the return to the government if the shares were redeemed was uncertain.... In the 1987 negotiations, the GOB achieved certainty when it agreed with Sidmar to exchange its Preferred Shares for [    ] in 2004. Given the array of possible outcomes in 2004 ... we find nothing inconsistent with commercial considerations in the GOB's decision to exchange the uncertain return for a certain amount equalling the face value of the shares.

*Redetermination* at 25 (footnote omitted).

Examining the second step of the 1987 transaction, Commerce states the GOB and Sidmar agreed payment for the shares would

be made in 1991, rather than wait until 2004 to redeem the shares at face value.

This step also potentially involved a government action inconsistent with commercial considerations. Specifically, in paying off in 1991 an amount owed in 2004, it was necessary for the parties to agree upon a [ ].... Because the [ ] we determined that "the total amount of money received by the GOB was more than what Sidmar should have paid for the Preferred Shares." Had the agreed upon [ ], we would have determined that Sidmar paid too little to redeem its shares in 1991 and that a benefit was conferred. However, given that this was not the case and, indeed, to the contrary that the [ ], we determined that the redemption of Sidmar's Preferred Shares was consistent with commercial considerations.

*Id.* at 26 (citation omitted).

### 3. Contentions of the Parties

Domestic Producers argue Commerce erroneously limits its analysis to the *redemption* of Sidmar's preferred shares and fails to examine the *purchase* of the shares, which Domestic Producers contend was on terms inconsistent with commercial considerations. Domestic Producers contend they have consistently alleged the GOB's purchase of Sidmar's preferred shares was on terms inconsistent with commercial considerations. (*See* Domestic Producers' Comments on *Redetermination* (Domestic Producers' Comments) at 6–10.) Domestic Producers also argue Commerce's failure to analyze whether the purchase of preferred shares was inconsistent with commercial considerations is not in accord with *Aimcor v. United States,* 18 C.I.T. 1117, 871 F.Supp. 447, 454 (1994), and the "tenor" of the Court's opinion in *Geneva Steel.* Therefore, Domestic Producers allege, the *Redetermination* is not supported by substantial evidence and is not in accordance with law as Commerce has failed to carry out its statutorily imposed mandate to countervail infusions inconsistent with commercial considerations. Accordingly, Domestic Producers request this matter be remanded to Commerce with instructions that Commerce "determine whether the GOB's 1984 purchase of Sidmar's preferred shares was on terms inconsistent with commercial considerations." (*Id.* at 15.)

Commerce responds Domestic Producers' opposition to the *Redetermination* on this point "constitutes a belated attempt to challenge the agency's original final affirmative countervailing duty determination concerning certain steel products from Belgium." (Def.'s Opp'n to Pls.' Comments on *Redetermination* (Def.'s Opp'n) at 4.) "[N]othing in its complaint or subsequent briefs can reasonably be considered a timely challenge of the terms under which Sidmar issued its Preferred Shares in 1984." (*Id.* at 5 (footnotes omitted).) Furthermore, Commerce argues, the Court specifically directed Commerce to examine on remand " 'whether Sidmar's *redemption* of preferred shares was on terms inconsistent with commercial considerations.' " (*Id.* at 4 (citation omitted) (emphasis in Def.'s Opp'n).) The Court could not have been more lucid or explicit, Commerce insists, in setting forth in the remand instructions that Commerce examine only the redemption of Sidmar's preferred shares—not their issuance in 1984. As to the Court's discussion of *Aimcor,* Commerce suggests this "reflects nothing more than the Court's natural desire to appreciate all the facts and nuances" of the matter. (*Id.* at 9 (citation omitted).)

### 4. Discussion

■ Domestic Producers' contention that Commerce erred in the *Redetermination* by not examining the issuance of Sidmar's preferred shares in 1984 and instead only analyzing the redemption of the shares is without merit. First, Domestic Producers did not challenge the issuance of Sidmar's preferred shares in their complaint.[3] Although the pleading requirements of U.S.

---

3. In their complaint, Domestic Producers allege, "The Department improperly found that the redemption of Sidmar's preferred shares in 1991 ... did not give rise to a countervailable benefit." *Geneva Steel v. United States,* No. 93–09–00566 (Complaint ¶ 113); *see also id.* ¶ 114 ("The

Department's findings ... that the redemption of Sidmar's preferred shares in 1991 did not give rise to a countervailable benefit are unsupported by substantial evidence on the administrative record....").

CIT R. 8(a) are to be construed liberally, the complaint still must provide sufficient notice to defendant as to the claims raised. *See United States v. F.A.G. Bearings, Ltd.,* 8 CIT 294, 297, 598 F.Supp. 401, 404 (1984). In this case, Domestic Producers' complaint does not raise the issuance of Sidmar's preferred shares to SNSN in 1984 as a cognizable cause of action. Nor does Domestic Producers' brief supporting their motion for judgment on the agency record explicitly raise the issue. In their brief, Domestic Producers only argued that Commerce improperly classified the preferred shares as equity and that Commerce "made the further erroneous conclusion that 'the redemption of the preferred shares in 1991 did not give rise to a countervailable benefit.'"[4] (*See* Mem. in Support of Domestic Producers' 56.2 Mot. for J. Upon Agency R. at 30 (footnote omitted); *see also id.* at 25, 31.)

Second, the Court's discussion in *Geneva Steel* and the accompanying order were explicit in directing Commerce to examine on remand the redemption of Sidmar's preferred shares. *See Geneva Steel,* 914 F.Supp. at 603 ("[T]he Court remands . . . to determine whether Sidmar's redemption of preferred shares as equity was on terms inconsistent with commercial considerations. . . ."); *id.* at 620 ("[I]t is hereby . . . ORDERED that Commerce shall determine whether Sidmar's redemption of preferred shares was on terms inconsistent with commercial considerations. . . ."). There is little room for argument as to the scope of the remand instructions when the instructions are as specific as they were in *Geneva Steel.* Accordingly, the Court finds Commerce complied with the Court's remand instructions and properly confined its remand determination to the redemption of Sidmar's preferred shares.

■ The Court now turns to Commerce's finding on *Redetermination* that the redemption of Sidmar's preferred shares was consistent with commercial considerations and not countervailable. Although Domestic Produc-

ers note "they are troubled by the Department's conclusion," they inform the Court of their decision "to not challenge the Department's finding that the redemption, in isolation, was commercially reasonable." (Domestic Producers' Comments at 4 n. 9; *see also id.* at 11 n. 19 ("While even in isolation [Commerce's assertion that the redemption of the preferred shares was on terms consistent with commercial considerations] is not altogether accurate, . . . Domestic Producers have not here challenged this point.").) Upon review of the record evidence and the agency's analysis in the *Redetermination* as summarized above, the Court holds Commerce's determination that the redemption of Sidmar's preferred shares was on terms consistent with commercial considerations and did not result in a countervailable event is based on substantial evidence and is otherwise in accordance with law.

### CONCLUSION

The Court holds Commerce's *Redetermination* is based on substantial evidence and is otherwise in accordance with law.

### JUDGMENT ORDER

This case having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that the Department of Commerce's *Redetermination on Remand, Final Countervailng* [sic] *Duty Determinations, Certain Steel Products From Belgium* (dated May 10, 1996), is sustained; and it is further

**ORDERED** this action is dismissed.

---

**4.** In their reply brief, Domestic Producers argue their case brief "described how the Department failed to countervail the subsidy provided by the GOB to Sidmar through the *issuance* and redemption of preferred shares." (Domestic Pro-

ducers' Reply Mem. at 9 (emphasis added).) The Court is not persuaded, however, that Domestic Producers' 56.2 brief expressly argued that the issuance of Sidmar's preferred shares was countervailable.