**Slip Op. 01-87**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| | : | |
| ALLEGHENY LUDLUM CORP., <u>et al.</u>, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **Before: WALLACH, Judge** |
| v. | : | **Court No.: 99-06-00362** |
| | : | |
| UNITED STATES, | : | |
| | : | **PUBLIC VERSION** |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ALZ N.V., | : | |
| | : | |
| Defendant-Intervenor. | : | |
_____ :

[The Department of Commerce's Remand Determination is Affirmed.]

Decided: July 18, 2001

<u>Collier Shannon Scott, PLLC</u> (<u>David A. Hartquist</u>, <u>Paul C. Rosenthal</u>, <u>R. Alan Luberda</u>, <u>Lynn Duffy Maloney</u>, and <u>John M. Herrmann</u>), for Plaintiffs.

<u>Stuart E. Schiffer</u>, Acting Assistant Attorney General; <u>David M. Cohen</u>, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch (<u>Michele D. Lynch</u> and <u>Lucius B. Lau</u>); <u>Arthur D. Sidney</u>, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

<u>O'Melveny & Myers LLP</u> (<u>Peggy A. Clarke</u>), for Defendant-Intervenor.

# I

## INTRODUCTION

Plaintiffs dispute the United States Department of Commerce International Trade Administration's ("Commerce" or "the Department") finding in the Final Results of Redetermination Pursuant to Court Remand, Allegheny Ludlum Corp., et al. v. United States (Dep't Commerce 2000) ("Remand Determination") that certain programs or transactions did not confer countervailable subsidies upon a Belgian producer of stainless steel coiled plate. Plaintiffs' challenge follows the court remand of Commerce's decision in Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Belgium, 64 Fed. Reg. 15567 (1999) ("Final Determination"). See Allegheny Ludlum Corp. v. United States, 112 F. Supp. 2d 1141(CIT 2000). Familiarity with the court's earlier opinion is presumed.

The court finds that Commerce has remedied the defects in its earlier decision by specifically articulating the basis for not including the Government of Belgium's 1984 purchase of stock in the Belgian steel company Siderurgie Maritime SA ("Sidmar") in its countervailing subsidy investigation, and affirms the Department's Remand Determination.

# II

## STANDARD OF REVIEW

In reviewing Commerce's determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory

purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-5, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987). "Substantial evidence is something more than a 'mere scintilla,'" and must be enough evidence to reasonably support the Department's conclusion. Id. at 405, 636 F. Supp. at 966.

## III

## BACKGROUND

On March 31, 1998, Plaintiffs filed a countervailing duty petition with Commerce that alleged a Belgian producer of stainless steel plate in coils, ALZ N.V. ("ALZ"), received an unfair benefit from various subsidies provided by the Government of Belgium ("GOB"), the regional Government of Flanders ("GOF") and the European Commission ("EC"). See Initiation of Countervailing Duty Investigations: Stainless Steel Plate in Coils from Belgium, Italy, the Republic of Korea, and the Republic of South Africa, 63 Fed. Reg. 23272 (Dep't Commerce 1998) ("Initiation Notice"). In Plaintiffs' initial petition, Plaintiffs also alleged that Belgian steel company Sidmar received subsidies from the GOB that were attributable to ALZ.

However, in the initial petition, Plaintiffs did not specifically identify the GOB's 1984 investments in Sidmar as a subsidy, and only made reference to them in a discussion of the overall Belgian Steel Industry. Commerce did not list these investments as subject to investigation in its Initiation Notice of April 28, 1998. See Initiation Notice, 63 Fed. Reg. at 23273. Moreover, Plaintiffs did not challenge or comment upon Commerce's failure to investigate these investments until just prior to the verification, when they requested that

3

Commerce examine the terms of the 1984 debt-to-equity conversion stock purchase (the "infusion") and verify the methodology used by the GOB to arrive at the value per share. See Letter from Petitioners to Commerce of November 6, 1998 at 9-10.

On August 28, 1998, Commerce issued its Preliminary Determination.[1] It issued its Final Determination on March 19, 1999 and declined to investigate that question because, it said, the infusion was brought to its attention following the statutory deadline and therefore untimely. See Final Determination, 64 Fed. Reg. at 15584 (finding the countervailable subsidy rate for ALZ to be 1.82 percent, ad valorem). However, based on Plaintiffs' challenge, the court concluded that the Final Determination was materially flawed in several respects and remanded it back to Commerce with specific instructions to cure these defects. See Allegheny Ludlum Corp., 112 F. Supp. 2d 1141, and Order of June 7, 2000 ("the Order").[2] For purposes of Plaintiffs' current

---

[1] Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Stainless Steel Plate in Coils From Belgium, 63 Fed. Reg. 47239, 47245 (1998) ("Preliminary Determination").

[2] In relevant part, the Order directed Commerce to:

(1)     either conform its decision not to accept Plaintiffs' new subsidy allegation (concerning the 1984 equity infusion in Siderurgie Maritime SA ("Sidmar")) with its prior decision to investigate untimely allegations concerning the Government of Belgium's 1987 and 1993 sales of ALZ stock to Sidmar, or explain on the record the reasons for this apparent inconsistency. To ensure consistency with other investigations, Commerce is also instructed to explain how its decision on remand comports with other instances where it has used its discretion to similarly reject or accept untimely allegations;

(2)     examine the record evidence concerning the 1984 equity infusion in Sidmar that it collected (or was put before it) during its investigation in this matter and, in light of 19 U.S.C. § 1677d (1994) and 19 C.F.R. § 351.311 (2000), discuss whether it had an obligation to investigate this transaction as a potential subsidy for the Final Determination. Should it find in the affirmative, Commerce is instructed to reopen its investigation, determine whether this transaction constitutes a countervailable subsidy,

4

challenge, the critical error identified upon remand was Commerce's failure to explain or justify its unwillingness to investigate the GOB's 1984 purchase of stock in Sidmar, despite an apparent statutory obligation to do so under 19 U.S.C. § 1677d.  See Allegheny Ludlum, 112 F. Supp. 2d at 1149-51.

On September 5, 2000, Commerce issued its Remand Determination in which it addressed each of the instructions.  However, Plaintiffs object to Commerce's response to the court's first and second instructions, which concern the infusion.  In short, Plaintiffs claim that Commerce failed to abide by the terms of the Order and that a further remand is necessary.

---

and (to the extent it does) adjust ALZ's net countervailable subsidy rate accordingly;

(3)     consider the significance of the statement in Sidmar's 1994 Financial Statement that Sidfin International ("Sidfin") "is administered by our group only" and determine whether, or how, this affects its conclusion that no countervailable benefit was conferred to Sidmar through the creation of Sidfin.  In so doing, Commerce shall examine this statement in light of Sidmar's subsequent explanation (noted in Sidmar's Verification Report at 6) that this statement was "perhaps a slight exaggeration intended to strengthen Sidmar's company image," as well as any other relevant record evidence;

(4)     clarify its methodology for determining whether a benefit was conferred to Sidmar through the creation of, and its participation in, Sidfin.  Specifically, Commerce is instructed to state why it examined "ownership," "control," and "profit" in determining whether a countervailing benefit had been conferred, and clarify the relative importance that it attributed to each of these or other factors.  Should Commerce determine upon remand that Sidmar actually controlled Sidfin, Commerce shall also discuss, in light of its methodology, whether (and if so, how) Sidmar's control affects its determination that a benefit had not been conferred upon Sidmar; and

(5)     should Commerce reverse its prior finding on remand and decide that a financial contribution was conferred to Sidmar through the Sidfin joint venture, examine and decide upon the propriety of using Plaintiffs' suggested share valuation methodology for (a) deciding whether a "benefit" was conferred for purposes of 19 U.S.C. § 1677(5)(E)(i) (1994); and; (b) if applicable, valuing the amount of subsidy conferred by Gimvindus[.]

5

## IV

## ARGUMENTS

## A

## Plaintiffs Argue Commerce Has Not Complied with the Court's Remand Order or the Statute.

Plaintiffs argue that "Commerce's analysis and conclusion" in the <u>Remand Determination</u> "are erroneous because they ignore the two-pronged nature of the Court's remand instructions." Plaintiffs' Response to the Commerce Department's Final Results of Redetermination Pursuant to Court Remand ("Plaintiffs' Response") at 2. The Plaintiffs assert that Commerce was instructed to engage in a two step analysis, which first required Commerce to determine whether it was obligated under 19 U.S.C. §1677d to examine the infusion. If this threshold question was answered in the affirmative, Commerce was then required to reopen its investigation to include the infusion. Therefore, Plaintiffs argue that Commerce improperly reached a conclusion regarding the existence of a subsidy through its "threshold inquiry into whether it had a statutory obligation, under the facts and circumstances presented, to include a 'possible subsidy' in its investigation." <u>Id.</u> Plaintiffs object to Commerce's conclusion that it was not obligated to reopen its investigation under § 1677d based on its view that since the infusion did not confer a benefit it could not possibly be a subsidy. Plaintiffs aver that this conclusion was based on a "backwards, result-oriented approach to the issue of Commerce's basic, threshold obligation to investigate a

6

potential subsidy practice [that] contravenes the very essence of the Court's remand instructions. . . ." Id. at 5 (emphasis in original).

Plaintiffs also argue that because Commerce determined there does not appear to be a possible subsidy in the absence of a benefit, Commerce has tacitly admitted that it "had an obligation to investigate this subsidy practice." Id. at 6. Plaintiffs cite several aspects of the Remand Determination in support of this argument. For example, plaintiffs refer to the Remand Determination's listing of record evidence regarding the infusion and argue that while such evidence is "directly relevant to the initial inquiry into whether to investigate," id., it is not a sufficient basis for Commerce to conclude that there was no subsidy practice at all. Rather, Plaintiffs concede that such a conclusion *could* be reached, but only, they say, *after* a complete § 1677d investigation. Moreover, the Plaintiffs argue that Commerce evaluated the evidence on the merits as it would in a final determination and that "very approach . . . shows that the record evidence should have caused Commerce to include the subsidy in its investigation." Id. at 7.

Plaintiffs' final argument is that Commerce's analysis improperly "raise[s] the bar" by making it more difficult to initiate a subsidy investigation and therefore circumvents the language of § 1677d. Plaintiffs maintain that Commerce's analysis unduly requires the petitioners to affirmatively establish a case for countervailability at the time the subsidy is alleged. Id. Plaintiffs further assert Commerce's position that "unless evidence indicated that the earlier finding regarding Sidmar's equityworthiness was in error, the Department had no basis to investigate the GOB's purchase of common shares," Remand Determination at 36, is unfounded given Plaintiffs' submission of evidence and discussion of Geneva Steel v. United States, 20 CIT 1083, 937 F. Supp. 946 (1996) to the contrary. Plaintiffs' Response at 8-9. Plaintiffs stress that this reasoning is improper insomuch as it requires an "affirmative showing of benefit from the

7

outset." Id. at 9.

As a result of this allegedly flawed approach, Plaintiffs claim that the second prong of the court's instruction regarding the infusion was improperly ignored, and that had Commerce properly engaged in the initial threshold inquiry regarding its duty to investigate the infusion, it would have necessarily conducted a § 1677d investigation. See id. at 9-11. As such, Plaintiffs aver that "Commerce's discussion of whether a benefit existed under the 1984 transaction attempts to analyze several important issues that must be addressed in a further remand." Id. at 10.

**B**

**Defendant Maintains that its Previous Decision is Supported by the Record Evidence and the Statute.**

Commerce maintains that it rendered its decision in compliance with the Order's instructions. Specifically, Commerce asserts that it "analyzed the 'information and argumentation' that were in the record in light of 19 U.S.C. § 1677d and 19 C.F.R. § 351.311 and explained 'why this evidence would not have triggered inclusion of this potential subsidy in [its] investigation.'" Defendant's Rebuttal Comments to the Plaintiffs' Response to the Final Results of Redetermination Pursuant to Court Remand ("Defendant's Rebuttal") at 5 (quoting Remand Determination at 16). Moreover, Commerce acknowledges "that where there is evidence of a possible subsidy, it has a statutory obligation to investigate that subsidy pursuant to 19 U.S.C. § 1677d." Id. at 4 (citing Remand Determination at 33).

As a result, Commerce asserts that it declined to reopen its investigation based on record evidence which indicates the "1984 investments do not appear to be possible subsidies." Id. at 7.

8

In addition, Commerce asserts that in so declining, it did not "raise the bar" for initiating an investigation of a potential countervailable subsidy as Plaintiffs argue. Rather, Commerce says that the evidence of a countervailing subsidy was simply insufficient to initiate an investigation. Moreover, Commerce claims that Plaintiffs' interpretation of its position is erroneous. Id. at 7-8. Specifically, Commerce stresses that under the record evidence it found, although there was clearly a financial contribution, "there was no evidence that Sidmar received a benefit from that financial contribution" and "[w]ithout a benefit, the practice cannot be considered a subsidy." Remand Determination at 31.

# V
## ANALYSIS

Although Commerce arrived at a conclusion regarding the potential subsidy, without engaging in a § 1677d investigation, its conclusion was warranted under the record evidence and in compliance with the statute and the Order. As the Order stated, Commerce is obligated to adhere to the scheme articulated in 19 U.S.C. § 1677d and 19 C.F.R. § 351.311 and had to

> examine the record evidence concerning the 1984 equity infusion in Sidmar that it collected (or was put before it) during its investigation in this matter and, in light of 19 U.S.C. § 1677d (1994) and 19 C.F.R. § 351.311 (2000), discuss whether it had an obligation to investigate this transaction as a potential subsidy for the Final Determination. Should it find in the affirmative, Commerce is instructed to reopen its investigation, determine whether this transaction constitutes a countervailable subsidy, and (to the extent it does) adjust ALZ's net countervailable subsidy rate accordingly.

June 7, 2000 Order, paragraph (2).

Thus, Commerce was instructed to determine if the record evidence, when analyzed, gave rise to an obligation to reopen their previous investigation to include the 1984 Sidmar

9

infusion.  In relevant part, 19 U.S.C. § 1677d provides as follows:

> If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which <u>appears to be a countervailable subsidy</u>, but was not included in the matters alleged in a countervailing duty petition . . . then the administering authority--
> (1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding . . . .

19 U.S.C. § 1677d (1994) (emphasis added).  In turn, 19 C.F.R. § 351.311 ("Countervailable

subsidy practice discovered during investigation or review") states in relevant part:

> (b) *Inclusion in proceeding*.  If during a countervailing duty investigation or a countervailing duty administrative review the Secretary discovers a practice that <u>appears to provide a countervailable subsidy</u> with respect to the subject merchandise and the practice was not alleged or examined in the proceeding . . . the Secretary will examine the practice, subsidy, or subsidy program if the Secretary concludes that sufficient time remains before the scheduled date for the final determination or final results of review.
> (c) *Deferral of examination*.  If the Secretary concludes that insufficient time remains before the scheduled date for the final determination or final results of review to examine the practice, subsidy, or subsidy program described in paragraph (b) of this section, the Secretary will:
> > (1) During an investigation, allow the petitioner to withdraw the petition without prejudice and resubmit it with an allegation with regard to the newly discovered practice, subsidy, or subsidy program; or
> > (2) During an investigation or review, defer consideration of the newly discovered practice, subsidy, or subsidy program until a subsequent administrative review, if any.
> (d) *Notice*.  The Secretary will notify the parties to the proceeding of any practice the Secretary discovers . . . .

19 C.F.R. § 351.311 (2000) (emphasis added).

Since the plain language of the statute and regulation only require Commerce to

investigate where there is a practice that "appears to be" or "appears to provide" a

countervailable subsidy, it follows that Commerce must first determine whether that threshold is met. On this point, the parties appear to agree. However, the parties disagree on the scope of the actual inquiry in which Commerce is obligated to engage.

While Plaintiffs argue that Commerce has exceeded the bounds of the threshold inquiry that § 1677d and the Order required of it, they do not attack the substance of Commerce's analysis. Rather, they contend this analysis is faulty only insomuch that it assessed the merits of the record evidence before Commerce. In other words, Plaintiffs claim that Commerce conducted its analysis in reverse, arguing that Commerce should have reached a conclusion only following a full § 1677d investigation. Plaintiffs stress that "the statute only requires Commerce to include a practice that 'appears' to be a subsidy, rendering Commerce's analysis on remand contrary to both the Court's instructions and the express statutory language." Plaintiffs' Response at 6. As Plaintiffs view the situation, "[u]nder Commerce's logic, because the agency affirmatively found that no subsidy existed, it had no obligation to examine an 'apparent' subsidy practice in its investigation." Id. at 5.

Although Plaintiffs assert the standard to determine if the infusion conferred a benefit is whether there is a "reasonable basis to believe or suspect" that such a benefit exists, through the course of their argument, they in essence interpret the term "appears" in both 19 U.S.C. § 1677d and C.F.R. § 351.311 to mean *immediately appears from the evidence in the record, without further analysis or consideration*. See Plaintiffs' Supplemental Memorandum Regarding the Commerce Department's Final Results of Redetermination Pursuant to Court Remand ("Plaintiffs' Supplemental Brief") at 2 (citing Countervailing Duties: Notice of Proposed

11

<u>Rulemaking and Request for Public Comments</u>, 54 Fed. Reg. 23366 (Dep't Commerce 1989)

("<u>1989 Proposed Regulations</u>") (proposed 19 C.F.R. § 355.44(e)(3)) and 19 C.F.R. §

351.507(a)(7)).  Therefore, the Plaintiffs fault Commerce for assessing the record evidence

beyond its immediate suggestion of an apparent subsidy.  Under this reasoning, Commerce's

analysis, which dispels any appearance that a subsidy existed, is an admission that the subject

practice "appears" to be a subsidy.[3]


**A**

**The Bounds of Commerce's § 1677d Threshold Inquiry Cannot be as Narrowly Defined as Plaintiffs Suggest**.


Both the controlling statute and its implementing regulation are silent as to the level of

inquiry required to determine whether the term "appears" is satisfied and the court is not aware

of any case law or legislative history that discusses the term in this context.  For example, the

Senate Report on the relevant section provides:

> Section 283(b) amends section 775 of the 1930 Tariff Act to provide that, where
> Commerce discovers during an investigation or review that a subsidy is in
> violation of Article 8, or appears to be countervailable despite not having been
> included in the countervailing duty petition, it shall include the subsidy in the
> investigation.

Sen. Rep. No. 103-412 at 106 (1994); <u>see also</u> H.R. Rep. No. 103-826 at 127 (1994).  Hence the

---

[3] Indeed, under this line of reasoning, it would follow that if Commerce is obligated to terminate its threshold inquiry following any possibility that an equity infusion is a countervailable subsidy, any further inquiry necessarily "raises the bar."

court is left to interpret this term against the overall statutory scheme.

In that context, the court concludes that the term "appears" cannot be construed as broadly as Plaintiffs demand. Plaintiffs' argument regarding the permissible scope of Commerce's initial inquiry is unpersuasive. Endorsing Plaintiffs' interpretation would force Commerce to engage in a complete countervailing duty investigation in any instance where there is even the slightest suggestion that a certain business practice is a countervailable subsidy.

This court is guided by the Federal Circuit's decision in American Lamb Co. v. United States, in which the court determined that the International Trade Commission ("ITC") is permitted to weigh "all evidence in applying the 'reasonable indication' standard of 19 U.S.C. § 1673b(a) in a preliminary investigation." American Lamb Co. v. United States, 785 F.2d 994, 997 (Fed. Cir. 1986). In American Lamb, the petitioners sought to have the ITC reconsider its decision not to conduct an antidumping investigation based on a negative preliminary determination. The controlling statute, 19 U.S.C. § 1673b, requires the ITC to conduct a full antidumping investigation where there is a "reasonable indication" of injury based on a preliminary investigation[4]. The lower court concluded that the ITC should have initiated an

_____

[4] 19 U.S.C. § 1673b provides, in relevant part:

(a) Determination by Commission of reasonable indication of injury.
  (1) General rule. Except in the case of a petition dismissed by the administering authority under section 1673a(c)(3) of this title, the Commission, within the time specified in paragraph (2), shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that--
    (A) an industry in the United States--
      (i) is materially injured, or
      (ii) is threatened with material injury, or
    (B) the establishment of an industry in the United States is materially retarded,

13

investigation if the petition adequately demonstrated a "mere possibility" that an injury was sustained. American Lamb, 785 F.2d at 1001.  In addition, the lower court concluded that the ITC was barred from weighing any negative evidence, thereby requiring "an affirmative preliminary determination . . . whenever information accompanying a petition raises the mere 'possibility' of material injury, regardless of any contrary evidence." Id. at 1001.  In reversing the lower court's decision, the Federal Circuit looked to the legislative history of the statute and the costly nature of antidumping investigations, stating:

> [T]he notion that allegations in a petition found unsupportable because of overwhelming contradictory evidence should nonetheless result in a full investigation and potential imposition of provisional remedies is directly contrary to Congress' intent, as above indicated, of eliminating "unnecessary and costly investigations" and the "impediment to trade" that would reside in an unwarranted imposition of provisional remedies. Considering and weighing, under ITC's guidelines, all evidence gathered within the 45 days available for conducting a preliminary investigation, on the other hand, effectuates that legislative intent.

Id. at 1004.

Although the Federal Circuit was guided by statutory language and legislative history that are absent from the current scenario, the underlying logic is applicable.  Countervailing duty investigations, like antidumping investigations, are costly and time consuming.  Surely, they warrant a sufficient factual basis for their initiation.  Although § 1677d offers a petitioner the opportunity to call Commerce's attention to a potentially countervailable subsidy that was discovered during the course of an ongoing countervailing duty investigation, it does not force

---

by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible.  If the Commission finds that imports of the subject merchandise are negligible or otherwise makes a negative determination under this paragraph, the investigation shall be terminated.

19 U.S.C. § 1673b (1994).

Commerce to fully investigate any subsidy. Rather, Commerce must review the record evidence to determine whether the business practice "appears" to be a countervailable subsidy. <u>See</u> 19 U.S.C. § 1677d; 19 C.F.R. § 351.311. This review must logically afford Commerce sufficient latitude to weigh and analyze both negative evidence and positive evidence. Moreover if, as Plaintiffs argue, Commerce's determination of whether a benefit was conferred is governed by the "reasonable basis to believe or suspect" standard[5], <u>see</u> Plaintiffs' Supplemental Brief at 2, then the above discussion of <u>American Lamb</u> is even more compelling.

―――――――――――――――――

[5] The <u>1989 Proposed Regulations</u> provide, in relevant part:

§§ 355.44 Existence of a countervailable benefit.
. . .

(e)(3) The Secretary will not investigate an equity infusion in a firm absent a specific allegation by the petitioner which is supported by information establishing a <u>reasonable basis to believe or suspect</u> that a firm has received an equity infusion which provides a countervailable benefit within the meaning of paragraph (e)(1) of this section.

54 Fed Reg. at 23380-81. (emphasis added).

Similarly, the <u>Countervailing Duties: Final Rule</u>, 63 Fed. Reg. 65348 (Dep't Commerce 1998) provides, in relevant part:

§§ 351.507 Equity.
. . .

(a)(7) Allegations. The Secretary will not investigate an equity infusion in a firm absent a specific allegation by the petitioner which is supported by information establishing a <u>reasonable basis to believe or suspect</u> that the firm received an equity infusion that provides a countervailable benefit within the meaning of paragraph (a)(1) of this section.

63 Fed. Reg. 65348, 65411; <u>see</u> 19 C.F.R. § 351.507(a)(7) (2000). (emphasis added).

15

The Plaintiffs misconstrue the actual nature of Commerce's analysis. Commerce, contrary to Plaintiffs' characterization, did not require an affirmative showing of a countervailable subsidy. Indeed as Plaintiffs state "nowhere does Commerce indicate that plaintiffs failed to 'allege' the elements of a subsidy (i.e., financial contribution, benefit, and specificity) with respect to the 1984 equity infusion, nor that this allegation was not supported by 'reasonably available' information. . . . Commerce itself provides a litany of all the reasonably available information that accompanied plaintiffs' argument concerning the 1984 infusion." Plaintiffs' Response at 8 (citing Remand Determination at 16-19).

Commerce, in fact, considered all the implications that sprang from the record evidence in support of, as well as against, finding a countervailable subsidy. See generally Remand Determination. For "while there was evidence of a financial contribution there was no evidence that Sidmar received a benefit from that financial contribution" and "[w]ithout a benefit, the practice cannot be considered a subsidy." Remand Determination at 31. Thus while a financial contribution occurred, that contribution did not appear to be a countervailable subsidy when the record evidence was analyzed, revealing the absence of a benefit.

The court does not concur with Plaintiffs that Commerce's analysis unfairly bypasses the second prong of the Order. Although Commerce engaged in analysis of the record evidence that arrived at a final conclusion, it was not the kind of "substantive analysis reserved for final determinations." Plaintiff's Response at 9. In fact, this analysis was significantly short of that reserved for final determinations. This, however, does not damage the credibility of the conclusion it reached. Rather, the fact that the above analysis is not as intensive as those

16

reserved for final determinations and yet manages to counter the appearance of a countervailable subsidy is indicative of the weak nature of that appearance.

**B**

**Commerce Properly Abided by the Order and 19 U.S.C. § 1677d in Declining to Reopen its Investigation to Include the 1984 Equity Infusion**.

Commerce enumerates the specific evidence relied upon within the record in determining whether the infusion was a possible subsidy practice and provides a thorough analysis of that evidence as well. See Remand Determination at 16-20. However Commerce also cautions that although it "attempts to be as inclusive as possible regarding potential subsidy practices which [it] learn[s] about during the course of an investigation . . . this does not mean that the Department goes on 'fishing expeditions,' investigating any and all government practices that might affect the respondents." Id. at 12-13. Rather, "the Department pursues those practices where the basic initiation threshold is met, i.e., there must be evidence on the record indicating that the elements necessary for the imposition of countervailing duties are present." Id. at 13. As such, Commerce concluded that the evidence on the record failed to satisfy the elements of a possible subsidy. In other words, the infusion did not *appear* to be a countervailable subsidy practice.

**1**

**Equityworthy Analysis**

The key characteristic of a countervailable purchase of shares is that such a purchase is

inconsistent with "commercial considerations." Remand Determination at 21. The original measure of what is consistent with commercial considerations is derived from the 1989 Proposed Countervailing Duty Regulations. See 1989 Proposed Regulations, 54 Fed. Reg. 23366. Those regulations directed Commerce, in the absence of publically traded shares with a corresponding market valuation for comparison, to simply make an "equityworthy" determination to establish whether the given share purchase was "consistent with commercial considerations." Remand Determination at 20-21. See also 1989 Proposed Regulations 54 Fed. Reg. at 23371 § 355.44(e)(1)(ii) ("If there is no market-determined price for a firm's shares (e.g., the firm's shares are not publicly traded), paragraph [§ 355.44(e)(1)(ii)] provides that a government equity infusion constitutes a countervailable benefit if the firm was not equityworthy (i.e., from the standpoint of a reasonable private investor, the firm was not a reasonable investment) and there is a rate of return shortfall within the meaning of § 355.49(e)."). Thus, the purchase of common shares in an equityworthy firm is consistent with commercial considerations.[6]

However, following the court's decisions in Aimcor v. United States, 18 CIT 1117, 1124, 871 F. Supp. 447, 454 (1994) ("[W]here a company is equity-worthy, as here, it does not necessarily follow that the purchase of stock from that company will be consistent with commercial considerations."), Aimcor v. United States, 19 CIT 1497, 912 F. Supp. 549 (1995),

---

[6] As Commerce's states in its Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Belgium, "[p]ursuant to the Department's equity methodology, a finding of equityworthiness means that the Department need not inquire further regarding the commercial soundness of a government's purchase of common shares. Hence, we determine that the GOB's 1985 purchase of common shares was consistent with the usual investment practice of private investors in Belgium." 64 Fed. Reg. 15567, 15570 (Dep't Commerce 1999).

18

and <u>Geneva Steel</u>, 20 CIT 1083, 937 F. Supp. 946, where special conditions are imposed upon the purchased shares, Commerce could no longer simply conclude its analysis upon finding the target company was equityworthy. Rather, a separate and more exhaustive analysis has to be conducted in order to determine whether the purchase of such shares qualifies as a countervailable subsidy.

Commerce maintains that it assessed the equityworthiness of Sidmar well prior to the instant action in <u>Final Affirmative Countervailing Duty Determinations: Certain Steel Products From Belgium</u>, 58 Fed. Reg. 37273 (Dep't Commerce 1993) ("<u>Belgian Certain Steel</u>"). There, in support of their argument that certain practices involving Sidmar and several other companies were in fact countervailable subsidies, the petitioners attacked the equityworthiness of Sidmar during 1984. <u>See</u> <u>Id.</u> at 37275.

**i**

**Given the Higher Initiation Threshold for Equityworthiness Investigations and Given the Fact Commerce's Previous Finding that Sidmar is Not Unequityworthy is Supported and Uncontested, Commerce Had Sufficient Information Before it to Consider Sidmar Equityworthy for the Limited Purpose of Buttressing its § 1677d Analysis.**

However, upon closer examination, the fact Commerce did not actually conduct an investigation to determine whether Sidmar was equityworthy is revealed. In fact, with regard to Sidmar's equityworthiness during 1984, Commerce stated in <u>Belgian Certain Steel</u>:

*Equityworthiness*

19

Petitioners have alleged that Sidmar was unequityworthy in 1984[.] . . . We did not initiate an investigation on petitioners' allegation that Sidmar was unequityworthy because the petition did not contain sufficient evidence to support the allegation. . . .Therefore, we have not made an equityworthiness determination for [this company].

Belgian Certain Steel, 54 Fed. Reg. at 37275.

Since Commerce saw, for the three years prior to 1984 (focusing on a three year window is Commerce's standard practice, see 1989 Proposed Regulations, 54 Fed. Reg. at 23381, § 355.44(e)(2)), improving rates of return on both equity and return on investment, as well as improving profits and ability to cover costs, it regarded the evidence in support of petitioners' allegations that Sidmar was unequityworthy as insufficient.[7]

---

[7] The General Issues Appendix to Belgian Certain Steel further explains Commerce's decision not to initiate an equityworthiness investigation of Sidmar:

Comment 14 (Belgium): Petitioners argue that there is sufficient information on the record to justify findings of uncreditworthiness and unequityworthiness for Sidmar as well.

Sidmar contends that petitioners' allegations concerning Sidmar's creditworthiness and equityworthiness are incorrect. Sidmar notes that the Department determined at initiation that it was creditworthy and equityworthy. Further, any new allegation contained in a case brief is untimely. According to the Department's regulations at 19 CFR 355.31(c), the Secretary will not consider any subsidy allegation submitted later than 40 days prior to the scheduled date of the preliminary determination.

DOC Position: Evidence on the record shows that in the three years prior to 1984, when Sidmar's debt was converted to equity, the company realized improving rates of return on both equity and return on investment. Profits also improved during this period. Additionally, the company was also generating sufficient revenue to meet its costs and fixed financial obligations. In view of this performance, the Department determined not to initiate on petitioners' uncreditworthiness and unequityworthiness allegations. Information supplied in the case brief on these allegations was essentially the same as that supplied in the

20

Although this was not a formal equityworthiness investigation, Commerce did rely

heavily on two of the four recommended indicators of equityworthiness listed in the 1989

Proposed Regulations.[8] Specifically, "[t]he principal criterion is whether a reasonable private

> petition. A small portion of the information in the case brief was new
> information, which we regarded as untimely. Therefore, we must affirm our
> determination at initiation that the petition did not provide good cause to initiate
> an investigation of Sidmar's unequityworthiness or uncreditworthiness.

Belgian Certain Steel, 54 Fed Reg. at 37248.

[8] Under the 1989 Proposed Regulations investigations of a company's equityworthiness was guided by four factors:

> If there is no market-determined price for a firm's shares (e.g., the firm's shares
> are not publicly traded), paragraph (e)(1)(ii) provides that a government equity
> infusion constitutes a countervailable benefit if the firm was not equityworthy
> (i.e., from the standpoint of a reasonable private investor, the firm was not a
> reasonable investment) and there is a rate of return shortfall within the meaning of
> § 355.49(e). Paragraph (e)(2) sets forth the basic criteria the Secretary will use in
> determining whether a firm is or is not equityworthy. The principal criterion is
> whether a reasonable private investor could expect from the firm a reasonable rate
> of return within a reasonable period of time. Subsidies Appendix at 18020.
> Factors that the Secretary may use to determine whether a firm can generate a
> reasonable rate of return include: (1) current and past indicators of a firm's
> financial health (e.g., current ratio, cash flow, debt-equity ratio), adjusted for
> generally accepted accounting principles where appropriate, see, e.g., Structural
> Shapes and Cold-Rolled Carbon Steel Flat-Rolled Products from Korea, 49 FR
> 47284 (1984); Certain Steel Products from South Africa, 49 FR 32426 (1984));
> (2) future financial prospects, see, e.g., Certain Carbon Steel Products from
> Brazil, 52 FR 829 (1987); Stainless Steel Plate from the United Kingdom, 51 FR
> 44656 (1986); (3) recent rate of return on equity, see, e.g., Certain Carbon Steel
> Products from Brazil, 49 FR 17988 (1984); and (4) participation by private
> investors, compare, Carbon Steel Wire Rod from Trinidad and Tobago, 49 FR 480
> (1984), with Fresh Atlantic Groundfish from Canada, 51 FR 10041 (1986). In this
> regard, the Department intends to continue its practice of assessing the firm as a
> whole, rather than a particular product line, because a private investor would
> consider the firm as a whole in making an investment decision. See, e.g., Fuel

investor could expect from the firm a reasonable rate of return within a reasonable period of time." 1989 Proposed Regulations 54 Fed. Reg. at 23371 (citations omitted). The 1989 Proposed Regulations provide four factors that Commerce *may* rely on in determining whether this criteria is met, including 1) current and past indicators of a firm's financial health; 2) future financial prospects; 3) recent rate of return on equity; and 4) participation by private investors. See supra note 8. It should be noted that these factors were derived individually from separate Commerce investigations and it appears that no one factor is afforded more weight than another. In Belgian Certain Steel, Commerce therefore declined to engage in any further inquiry of Sidmar's equityworthiness, having already assessed its equityworthiness against factor #1 (past indicators of financial health) and factor #3 (return on equity).

Although this is not, as Defendant-Intervenor argues, a situation where "the Department had before it all the evidence it examines in making an equityworthiness determination", Defendant-Intervenor's Supplemental Memorandum at 5, it is one in which Commerce possessed a respectable body of evidence weighing in favor of an equityworthiness finding. And although this is not equivalent to stating Sidmar is equityworthy,[9] it is sufficient for purposes of supporting

Ethanol from Brazil, 51 FR 3361 (1986).

1989 Proposed Regulations, 54 Fed. Reg. at 23371.

[9] Defendant admits that "[b]ecause the insufficient allegations in Belgian Certain Steel did not require that Commerce perform a full and complete investigation into Sidmar's equityworthiness, Commerce cannot say that the finding in Belgian Certain Steel that Sidmar was not unequityworthy would be tantamount to a finding that Sidmar was equityworthy in this investigation." Supplemental Memorandum of the United States Responding to February 23, 2001 Court Order at 6.

22

Commerce's assertion that the subject equity infusion did not appear to be a countervailable subsidy under 19 U.S.C. § 1677d.

Given the higher initiation threshold for countervailing duty investigations in general, the same initiation threshold logically must apply to equityworthiness investigations as well, since the latter is really simply part of the former's overall investigative framework. Commerce's duty to investigate a company's equityworthiness is triggered under § 1677d, as a result of discovering a possible subsidy during the course of an investigation, and under the 1989 Proposed Regulations, in response to an allegation raised by petitioner, sufficiently supported by evidence of unequityworthiness. See 19 U.S.C § 1677d; 1989 Proposed Regulations, 54 Fed. Reg. at 23380-81, § 355.44(e)(3). In its Remand Determination, Commerce explained that creditworthiness and equityworthiness investigations are governed by a higher initiation standard to compensate for their laborious and difficult nature. Remand Determination at 11 ("both creditworthiness and equityworthiness analyses were recognized by the Department as being difficult. As a consequence, the Department set higher initiation thresholds for such allegations."); see also 1989 Proposed Regulations, 54 Fed. Reg. at 23371 ("investigations of equity infusions, like investigations of creditworthiness, add substantially to the work involved in a CVD or review.").

Given this higher initiation standard, Commerce must be allowed to rely on a previous finding that a target company was not unequityworthy in the fashion it has here. Forcing Commerce to engage in a complete equityworthiness investigation, after its previous finding that Sidmar was not unequityworthy and the failure of the current and previous petitioners to offer

23

evidence to the contrary, would effectively destroy the higher initiation standard. Such a course of action would allow a petitioner to demand a complete equityworthiness investigation in every instance where a § 1677d investigation might lie. This cannot be the result envisioned by either the regulations or the statute. At the very least, Plaintiffs must offer evidence against Commerce's finding in Belgian Certain Steel before demanding Commerce engage in a complete equityworthiness investigation of Sidmar. Since they have not done so here and based on the above analysis of Commerce's equityworthiness finding, the court concludes that Commerce may rely on this finding in support of its decision not to engage in a full countervailing duty investigation of the infusion.

**2**

**Common Shares**

Based on Commerce's original conclusion that Sidmar was equityworthy in 1984 as stated in Belgian Certain Steel, Commerce concludes that it did not have to include the GOB's 1984 purchase of common shares in Sidmar in its investigation. Remand Determination at 24-25. As discussed, this conclusion enjoys the support of both Commerce's own regulations, see 1989 Proposed Regulations, and the relevant case law. See Aimcor, 18 CIT at 1124, 871 F. Supp. at 454; Aimcor, 19 CIT 1497, 912 F. Supp. 549; Geneva Steel, 20 CIT 1083, 937 F. Supp. 946 (1996); Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Belgium, 64 Fed. Reg. at 15570.

24

**3**

**Preferred Shares**

Despite its finding of equityworthiness, with respect to the GOB's purchase of preferred shares, Commerce, as required, examines each restriction imposed on this class of shares and adjusts the shares' purchase price accordingly. Indeed, Commerce discusses each restriction individually and provides its rationale for any adjustment imposed or forgone. See Remand Determination at 23-25. In addition, Commerce distances the purchase of the preference shares from any acknowledged GOB steel industry restructuring initiative. As Commerce states, "[t]he preference shares were purchased through a debt-to-equity conversion, with the GOB assuming BF11,332,804,500 worth of Sidmar debt in exchange for 839,467 preferred shares valued at BF13,500 per share. The preferred shares did not carry any voting rights." Remand Determination at 16.

Commerce begins with two reports prepared by the Commissare-Reviseur, "the statutory auditor, the person responsible for determining and certifying that shares and contributions are properly valued," ALZ August 3, 1998 Supplemental Questionnaire Response at 16. That report established the purchase price for common shares of Sidmar at BF (Belgian Francs) 21,579, based upon Sidmar's "substantial" value and its "profitability" or "yield" value. Id. at 16. See Geneva Steel, 20 C.I.T. at 1085-86, 937 F. Supp. at 948 (Commerce, with court's approval, uses common shares of target company as best alternative benchmark for assessing the preference shares in the absence of publically traded shares.)

Using this number "without objection" as the starting point for its analysis of the GOB's purchase of Sidmar preference shares, Commerce adjusted that price downward to reflect the inferior aspects of the preferred shares vis a vis the common shares. For example, while Commerce takes note that the subject preferred shares had a dividend cap of 2%,[10] while other common and preferred shares potentially enjoyed greater dividends, it discounts the purchase price by 3% to reflect the shares' absent voting rights as it considers that to be the "one clearly inferior aspect" of the preferred shares.[11] Remand Determination at 24.

Nonetheless, on balance, Commerce recognized various other features of the subject preferred shares entitled them to a higher valuation. See id. First, the subject shares had the right to priority dividends, meaning that where profits are distributed, the subject preferred share

_____

[10] Commerce declined to adjust the purchase price to reflect the 2% dividend cap, because the "[i]nformation on these dividend rights was taken from a 1985 agreement between the GOB and Sidmar relating to the 1985 acquisition of Sidmar's PB's." Remand Determination at 24 (internal punctuation omitted). Commerce goes on to state that "[w]e note that it is the Department's practice to consider information available at the time of the equity infusion." Id. (citing 1989 Proposed Regulations, 54 Fed. Reg. at 23380-81, § 355.44(e)(2)). Moreover, although Royal Decree No. 245 of December 1983 specified a *minimum* dividend of 2% prior to the 1984 purchase, it does not necessarily follow that the GOB was aware of the *maximum* dividend cap at the time of that purchase. Accordingly, the 2% minimum within Royal Decree No. 245 was cast in terms of a benefit and could not have adversely impacted the GOB's understanding of the infusion at the time of the transaction.

[11] The preference share purchase was made pursuant to Royal Decree No. 245 of December 31, 1983, which mandated the shares "(1) confer a preferred dividend of at least 2 percent of the nominal value (i.e., dividends of at least 2 percent would be paid on preference shares before dividends would be paid on any other shares or profit-sharing bonds); (2) have a preferred redemption/reimbursement status, and (3) receive voting rights in certain specified situations. Among these situations, the preference shares would become voting shares after 20 years (unless redeemed)."

Remand Determination at 19 (citing Royal Decree No. 245).

holders receive their portion before the common share holders. Id. In addition, the GOB was assured that regardless of price fluctuations in the common shares, the GOB could redeem its preference shares for the original price paid, thereby insulating the GOB from any real risk and assuring that it "would (at least) be made whole". Id.

The court takes note of the fact that although the GOB was originally content with the common share price of BF21,579 for the preference shares, that price was ultimately reduced under review of the European Commission ("EC") to BF13,500 per share, as the EC had to determine if the transaction had "elements of support." Id. at 18. In fact, the EC, before the GOB purchase even ensued, adjusted the purchase price to reflect the inferior aspects of the shares and to ensure "that no aid measures may be incorporated." Id. (quoting September 1984 Report of Commissaire-Reviseur at 11). Therefore "a minus-value of BF 8,079 per share was assigned to the calculated economic value of BF21,579 per share." Id. Moreover, the EC noted that this reduction "did not imply that the economic value of BF21,579 per share had been dismissed." Id. Hence, the GOB ultimately, "[i]nstead of purchasing 525,178 shares at BF 21,579 per share . . . purchased 839,467 shares at a price of BF13,500 per share." Remand Determination at 19.

Despite the fact the preferred shares were limited by a dividend cap, the court finds reasonable Commerce's determination that the purchase of these shares in an equityworthy Sidmar was consistent with commercial considerations. Therefore, "it is evident that the price paid per share by the GOB for Sidmar's preference shares in 1984 was significantly less than the adjusted common share benchmark price." Id. at 24. This court finds compelling the GOB's

27

assured priority dividends in conjunction with the assurance of a being made whole upon redemption.[12]  Those facts, coupled with the EC's downward price adjustment provide sufficient support for the conclusion that the purchase of these preference shares was consistent with commercial considerations.  Clearly an investment in an equityworthy company where, at the very least, the investor is guaranteed to recover the initial investment, is not only consistent with commercial considerations but in excess of that threshold.

## VI

**The 1999 Regulations Do Not Apply to the Current Countervailing Duty Investigation.**

The parties each argue that a different set of regulations govern the current countervailing duty investigation.  Commerce argues that the current investigation, whose petition was filed March 31, 1998, is governed by the 1989 Proposed Regulations, while Plaintiffs argue the current 1999 Regulations[13] apply.

Prior to the implementation of the 1999 Regulations, the Proposed 1989 Regulations,

---

[12] Plaintiffs argue the fact the GOB reaped only the net present value of the preference shares upon redemption in 1991, based on a target redemption date of 2004, undercuts the value of the preference shares' guaranteed minimum return.  See Geneva Steel v. United States, 914 F. Supp. 563, 600 (CIT 1996).  The court does not concur.  A reasonable time frame for redemption does not detract from the guaranteed minimum value for the preference shares reflecting the purchase price, irrespective of any fluctuations in Sidmar's economic health.  Thus, these preference shares were shielded from erosion in value due to poor performance.

[13] Countervailing Duties: Final Rule, 63 Fed. Reg. 65348 (Dep't Commerce 1998) ("1999 Regulations").

although never formally implemented, essentially codified Commerce's countervailing duty investigation practices. See Remand Determination at 10, n.17 ("While a final version of these regulations was never promulgated, the Department relied on the 1989 Proposed Regulations as a statement of it [sic] practice in many areas until adoption of its current regulations in November 1998."). However, the 1999 Regulations, by their terms, apply to countervailing duty investigations initiated after December 28, 1998. See 19 C.F.R. § 351.702(a)(1) (1999). Although the Plaintiffs concede this obvious limitation, they argue that the 1999 Regulations direct Commerce to apply its terms to a countervailing determination commenced prior to its effective date, when "the previous methodology was invalidated by the [Uruguay Round Agreements Act], in which case the Secretary will treat subpart E of this part as a restatement of the Department's interpretation of the requirements of the [Tariff Act of 1930] as amended by the [Uruguay Round Agreements Act]. 19 C.F.R. § 351.702(b) (1999) (emphasis added); see Plaintiffs' Supplemental Brief at 4.

Plaintiffs further argue that as a result of the 1999 Regulations' expansion of the equityworthiness analysis, they override the 1989 Proposed Regulations. The 1999 Regulations require a government entity that made an equity infusion to provide Commerce with a report, prepared prior to the infusion, that contains an objective analysis of the target company. Under the 1999 Regulations, such a report demonstrates that the government entity behaved as a private investor whose "usual investment practice . . . [is] to evaluate the potential risk versus the expected return." 1999 Regulations, 63 Fed. Reg. at 65373. In the absence of such a report, it "is unlikely that [Commerce] would find that the infusion was in accordance with the usual

investment practice of a private investor." Id. Plaintiffs also direct the court's attention to Commerce's comment that the revised equityworthiness evaluation process "better reflects the principles set forth in the statute, [Statement of Administrative Action], and the [Agreement on Subsidies and Countervailing Measures]. . . ." Id. at 65372. Based on this statement, the Plaintiffs argue that "Commerce officially found that the equityworthiness analysis of the 1989 Proposed Regulations does not properly effectuate" the Tariff Act of 1930 and Commerce's own regulations and therefore the 1999 Regulations control. Plaintiffs' Supplemental Brief at 6. Plaintiffs additionally point out that the Uruguay Round Agreements Act changed the statutory language regarding the investigation of equity infusions, so that Commerce no longer judged if the infusion was "inconsistent with commercial considerations", 19 U.S.C. § 1677(5)(A)(ii)(I) (1994), but rather whether the infusion was "inconsistent with the usual investment practice of private investors. . ." 19 U.S.C. § 1677(5)(E)(i) (2000). They claim the new language, in conjunction with the additional objective report requirement of the 1999 Regulations, supports their conclusion. If applicable, the 1999 Regulations would most likely demand a formal equityworthiness investigation. Indeed, in the instant case, the GOB did not prepare such a report, and as conceded by Commerce, "consistent with [the 1999 Regulations], the GOB's actions were not consistent with those of a reasonable private investor." Remand Determination at 22.

However, Plaintiffs misconstrue the 1999 Regulations analysis as a wholesale invalidation of the older analysis. Instead, the 1999 Regulations simply build upon the older

30

analysis with the new objective report factor.[14]  Moreover, Commerce simply states this revised

---

[14] In fact, aside from the added paragraph concerning an objective investment report, the equityworthiness standards in the 1999 Regulations are essentially identical to those within the 1989 Proposed Regulations:

> (4) *Equityworthiness.* --(i) *In general.*  The Secretary will consider a firm to have been equityworthy if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time.  The Secretary may, in appropriate circumstances, focus its equityworthiness analysis on a project rather than the company as a whole.  In making the equityworthiness determination, the Secretary may examine the following factors, among others:
>
>> (A) Objective analyses of the future financial prospects of the recipient firm or the project as indicated by, *inter alia,* market studies, economic forecasts, and project or loan appraisals prepared prior to the government-provided equity infusion in question;
>>
>> (B) Current and past indicators of the recipient firm's financial health calculated from the firm's statements and accounts, adjusted, if appropriate, to conform to generally accepted accounting principles;
>>
>> (C) Rates of return on equity in the three years prior to the government equity infusion; and
>>
>> (D) Equity investment in the firm by private investors.
>
> (ii) *Significance of a pre-infusion objective analysis.*  For purposes of making an equityworthiness determination, the Secretary will request and normally require from the respondents the information and analysis completed prior to the infusion, upon which the government based its decision to provide the equity infusion (*see,* paragraph (a)(4)(i)(A) of this section).  Absent the existence or provision of an objective analysis, containing information typically examined by potential private investors considering an equity investment, the Secretary will normally determine that the equity infusion received provides a countervailable benefit within the meaning of paragraph (a)(1) of this section.  The Secretary will not necessarily make such a determination if the absence of an objective analysis is consistent with the actions of reasonable private investors in the country in question.

31

analysis "better reflects" the 1930 Tariff Act and Commerce's obligations under the Uruguay Round Agreement Act. This language is not tantamount to an official conclusion that the <u>1989 Proposed Regulations</u> analysis failed to properly effectuate the Act, nor it is it strong enough to even *imply* that the older analysis is invalidated.

To conclude otherwise would be to open the door to retroactive application of the <u>1999 Regulations</u> in any case where they build upon their predecessor. Plaintiffs simply cannot rely on the <u>1999 Regulations</u> to force Commerce to engage in a full equityworthiness investigation; the current investigation is properly governed by their predecessor.

---

<u>1999 Regulations</u>, 63 Fed. Reg. at 65410-11.

# VI

## CONCLUSION

For the foregoing reasons, the court finds that Commerce's <u>Remand Determination</u> is

supported by substantial evidence and is otherwise in accordance with the law.[15]


_____
Evan J. Wallach, Judge

Dated: July 18, 2001
New York, New York

---

[15] The court is aware of the recent preliminary determination in <u>Stainless Steel Plate in Coils from Belgium: Preliminary Results of Countervailing Duty Administrative Review</u>, 66 Fed. Reg. 20425 (Dep't Commerce 2001) ("Preliminary Results") within which Commerce found the subject infusion countervailable. The court, however, notes the fact that the Preliminary Results are based on the <u>1999 Regulations</u>, not the <u>1989 Proposed Regulations</u>, and therefore regards that investigation as separate with unique circumstances and issues.