**AIMCOR, ALABAMA SILICON, INC.
and American Alloys, Inc.,
Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant,**

and

**CVG–Venezolana de Ferrosilicio,
C.A., Defendant–Appellant.**

**No. 97–1266.**

United States Court of Appeals,
Federal Circuit.

Sept. 9, 1998.

William D. Kramer, Baker & Botts, L.L.P., Washington, DC, argued for plaintiffs-appellees. With him on the brief was Clifford E. Stevens, Jr. Of counsel was Martin Schaefermeier.

Cynthia B. Schultz, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. Of counsel were David M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director.

Donald B. Cameron, Kaye, Scholer, Fierman, Hays & Handler, LLP, Washington, DC, argued for defendant-appellant. With him on the brief was Julie C. Mendoza.

Before RICH, PAULINE NEWMAN, and SCHALL, Circuit Judges.

RICH, Circuit Judge.

This appeal is from a judgment entered 31 December 1996 by the United States Court of International Trade in a countervailing duties case, No. 93–06–00322, involving ferrosilicon imported from Venezuela. The Court of International Trade sustained a Second Remand Determination of the International Trade Administration of the United States Department of Commerce ("Commerce"), which found a countervailable subsidy rate. For the reasons set forth below, we affirm-in-part, reverse-in-part, and remand.

## BACKGROUND

Plaintiffs–Appellees, Aimcor, Alabama Silicon, Inc., and American Alloys, Inc. (collectively "Aimcor"), are domestic producers, manufacturers, or resellers of ferrosilicon that filed a countervailing duty petition with Commerce alleging that Defendant–Appellant, CVG–Venezolana de Ferrosilicio, C.A., ("FESILVEN"), the sole Venezuelan producer and exporter of ferrosilicon, received countervailable subsidies from the Venezuelan government in its production and exportation of ferrosilicon to the United States. Commerce undertook a countervailing duty investigation for the calendar year 1991, which resulted in a Final Affirmative Countervailing Duty Determination ("Final Determination") deciding that FESILVEN was receiving subsidies from the Government of Venezuela or companies owned by the Government of Venezuela (collectively, "GOV"). *Final Affirmative Countervailing Duty Determination: Ferrosilicon From Venezuela; and Countervailing Duty Order for Certain Ferrosilicon From Venezuela,* 58 Fed.Reg. 27,539 (May 10, 1993).

The particular subsidy at issue in this appeal stems from GOV's purchase of certain Class "E" shares of FESILVEN stock.[1]

---

1. Commerce also found a subsidy based on preferential electricity rates. That subsidy is not at

FESILVEN is a closely-held company whose stock is owned by GOV and certain private shareholders from Venezuela and elsewhere.

Before 1989, FESILVEN had issued three classes of stock: Classes "A," "B," and "C." Classes A and B are preferred stock entitled to cumulative annual dividends of 10% of their par value. Class C shares are common stock issued as part of a debt-to-equity conversion during a restructuring of FESILVEN's corporate debt. In November of 1989, FESILVEN approved a new class of stock, Class "D," to increase capital. Class D was a preferred stock entitled to cumulative annual dividends of 20% of its par value. In December of that year, FESILVEN amended Clause Seven of its Articles of Incorporation/Bylaws to further address the relative rights to receive dividends and liquidation proceeds of the four classes of then-outstanding stock. It was FESILVEN's practice to amend its Articles of Incorporation/Bylaws each time it altered the number of outstanding shares of a class of stock or added a new class of stock.

In December of 1991, FESILVEN issued a new class of common stock, Class "E." Class E stock was issued at least in part because the fixed assets of the company had been re-valued at an increased amount; and part of the Class E stock was distributed proportionally to existing shareholders based on the number of shares owned. Class E shares were also issued to increase FESILVEN's capital. These additional shares were almost all purchased by GOV—the record indicates that only one other investor bought some of these shares. The Articles of Incorporation/Bylaws gave existing shareholders a right of preference (or first refusal) to purchase these shares in proportion to the amount of stock already owned. While Clause Four of the Articles of Incorporation/Bylaws was amended to include the Class E stock in the total stock issued, Clause Seven was not amended to clarify the rights of this stock, as had been done when Class D stock was issued.

In the Final Determination, Commerce decided that GOV's purchase of Class E shares was consistent with commercial considerations ·and, thus, not countervailable. 58 issue in this appeal.

Fed.Reg. at 27,542. On 13 December 1994, the Court of International Trade remanded Commerce's Final Determination because "further consideration [was] required to determine whether the purchase of Class 'E' shares was inconsistent with commercial considerations." *Aimcor v. United States,* 871 F.Supp. 447, 454 (CIT 1994) (*"Aimcor I"*). On remand, Commerce again determined that GOV's purchase of Class E shares was consistent with commercial considerations. On 29 December 1995, the Court of International Trade found that Commerce's remand results were not supported by substantial evidence and remanded the case to Commerce "to determine the appropriate countervailing duty for GOV's equity infusion into FESILVEN in 1991." *Aimcor v. United States,* 912 F.Supp. 549, 555 (CIT 1995) (*"Aimcor II"*). The Court of International Trade instructed Commerce to determine the appropriate countervailing duty. *Id.* In an order dated 09 April 1996, the Court of International Trade further instructed Commerce to employ the standard grant methodology for calculating the duty rate. *Aimcor v. Unted States,* No. 93–06–00322, (Apr. 9, 1996 Order). In applying this standard methodology, Commerce treats the full amount of an equity infusion as a subsidy and allocates a portion of the subsidy to the period under investigation or review. *See Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments,* 54 Fed.Reg. 23,366, 23,384 (May 31, 1989). Pursuant to the Court of International Trade's instructions, Commerce issued its second set of remand results, which were affirmed by the Court of International Trade on 31 December 1996, *see Aimcor v. United States,* 960 F.Supp. 305, ——, slip op. at 4 (CIT 1996) (*"Aimcor III"*), and which are now on appeal before us.

## ANALYSIS

■ We review *de novo* a decision of the Court of International Trade reviewing the final results of an administrative review ·by Commerce. *See Torrington Co. v. United States,* 82 F.3d 1039, 1044 (Fed.Cir.1996). In so doing, we "apply anew" the Court of. In-

ternational Trade's statutorily-mandated standard of review. *See id.* We uphold Commerce's final results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (internal quotations and citations omitted). We decide *de novo* the proper interpretation of governing statutory provisions. *See Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1570 (Fed.Cir.1994).

The governing statutory provision in this case is 19 U.S.C. § 1677(5) (1988), which provides in pertinent part:

> (A) The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in Section 1303 of this title, and includes, but is not limited to, the following:
>
> . . .
>
> (ii) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned and whether paid or bestowed directly or indirectly on the manufacture, production, or export or any class or kind of merchandise:
>
> (I) *The provision of capital,* loans, or loan guarantees *on terms inconsistent with commercial considerations.*

(emphasis added).[2] The central question on appeal is whether GOV's purchase of FESILVEN Class E stock was a subsidy because it was inconsistent with commercial considerations.

■ Before reaching this central substantive issue, we must decide as a procedural matter which of the prior *Aimcor* decisions we may now review: *Aimcor I, Aimcor II, Aimcor III,* or all three. The final judgment rule requires that a party raise all claims of error after an order "ends the litigation on the merits and leaves nothing for the court to do but execute judgment." *Cabot Corp. v. United States,* 788 F.2d 1539, 1542 (Fed.Cir. 1986) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 373, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)). We have previously held that decisions remanding to an administrative agency are not appealable:

> We conclude that the court's order is not a final appealable order. Where, as here, the trial court remands to the administrative agency for additional findings, determination, and redetermination, the remand order is not appealable even though the order resolves an important legal issue such as the applicable standard for countervailability.

*Id.* at 1543. FESILVEN could not have previously appealed the decisions in *Aimcor I* or *Aimcor II* because no final decision had issued. This is the first opportunity for FESILVEN to challenge those decisions. Therefore, we conclude that we may review the decisions in each of those cases as part of this appeal.

■ Turning to the decisions of the Court of International Trade, we begin by concluding that the Court of International Trade was correct in reversing Commerce's finding that Class E shares were entitled to dividends and liquidation proceeds. Although, as we will discuss further below, several of the applicable default rules do require that all classes of stock have equal rights, Class E shares are expressly treated differently concerning dividends and liquidation proceeds because of Clause Seven of FESILVEN's Articles of Incorporation/Bylaws.

The applicable default rules requiring that all class of stock have equal rights include Article 292 of the Venezuelan Commercial

---

2. The antidumping statutes were amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). The URAA does not apply to investigations initiated before January 1, 1995. *See* URAA § 291(a)(2), (b); *see also NSK Ltd. v. United States,* 115 F.3d 965, 968 n. 3 (Fed.Cir.1997). Since the investigation in this case was initiated prior to January 1, 1995, the resolution of this appeal is governed by the antidumping laws in effect before enactment of the URAA. In the interest of convenience, we use the present tense when referring to those laws. All citations to the United States Code are to the 1988 edition, unless otherwise noted. *See Aimcor v. United States,* 141 F.3d 1098, 1100 n. 2 (Fed.Cir.1998).

Code and Clause Five of FESILVEN's Articles of Incorporation/Bylaws. Article 292 of the Venezuelan Commercial Code requires that all shares of stock in a company have equal rights unless the company's articles of incorporation provide otherwise. Similarly, Clause Five of FESILVEN's Articles of Incorporation/Bylaws provides that "[a]ll shares will ... confer upon their legitimate owners equal rights and obligations in everything, unless expressly indicated in this document," and Clause Six provides that "[d]ividends on each share will be distributed among the shareholders in proportion to the paid-in-capital."

Yet, the equal rights regime set up by these default provisions is altered by Clause Seven of FESILVEN's Articles of Incorporation/Bylaws. Point Five of Clause Seven governs dividends and provides:

> The Class "D," "A," and "B" shares will participate proportionately with the Class "C" shares in the remainder of liquid profits, if any, once the portion for the Class "D," "A," and "B" shares has been set aside.

Therefore, pursuant to Point Five of Clause Seven, Class E will not receive dividends—which are divided first among the preferred classes, Classes A, B, and D, and then among the preferred and original common class, Classes A, B, C, and D. Point Six of Clause Seven governs the rights to liquidation proceeds, and similarly expressly limits the rights to liquidation proceeds to Classes A, B, C, and D. Indeed, FESILVEN could have easily provided for Class E shareholders to receive dividends and liquidation proceeds, by amending Clause Seven as had been done earlier, when the Class D shares had been created. Therefore, we affirm the Court of International Trade on this issue.

We conclude that the Court of International Trade was not correct, however, in its decision regarding the ability of the owners of Class E shares to enjoy capital appreciation. We conclude that the Court of International Trade erred in finding unsupported by substantial evidence Commerce's determination that Class E stock could generate a reasonable return. Commerce concluded that FESILVEN's retained profit allocation practice does allow Class E shareholders to enjoy capital appreciation on their invest-

ment. *See Final Results of Remand Determination Pursuant to Court Remand, Aimcor v. United States*, No. 93–06–00322, slip. op. at 4–6 (Mar. 30, 1995) ("*Remand Determination*"). In particular, Commerce concluded that FESILVEN was in the practice of distributing retained profits through the issuance of new additional stock. *Id.* Commerce reasoned that these new shares of additional stock were required to be distributed equally among all outstanding classes of stock because of the applicable default rules requiring that all classes of shares have equal rights—e.g., Article 292 of the Venezuelan Commercial Code and Clause Five of FESILVEN's Articles of Incorporation/Bylaws. *Id.* Commerce further stated that its conclusion was bolstered by the factual finding that at least one private shareholder bought Class E shares. *Id.* at 8. We conclude that Commerce's factual findings—especially regarding FESILVEN's practice of distributing retained profits through the issuance of new additional stock—provided substantial evidence to support its conclusion that such distributions would permit owners of Class E stock to enjoy capital appreciation.

We further conclude that the Court of International Trade was not correct in its decision regarding alleged sales restrictions at par value on shares of Class E Stock, which would also have limited the ability of owners to enjoy capital appreciation. We conclude that the Court of International Trade erred in finding unsupported by substantial evidence Commerce's determination that Class E stock bore no legal restrictions on their sales price. Commerce concluded that FESILVEN's retained profits would "simply allow the value of ... outstanding shares to increase as the company's net worth increases." *Remand Determination* at 5. Commerce noted that any restriction on the sale of Class E shares at par value "results from the company's practice of distributing additional shares to allocate retained profit," *id.* at 15–16, but that there are "no *legal* restrictions," *id.* at 14 (emphasis in original). We conclude that Commerce's factual findings of no legal sales restrictions on Class E shares provided substantial evidence to support its conclusion that increases in

**1380**

share value would permit owners of Class E stock to enjoy capital appreciation.

Therefore, we conclude that the Court of International Trade erred in reversing Commerce's determination that owners of Class E stock could enjoy capital appreciation. But this determination does not entirely resolve the broader question of whether this potential for capital appreciation was sufficient to make the purchase of Class E shares consistent with commercial considerations and thereby not a subsidy. Thus, we must remand to the Court of International Trade for a determination as to whether this potential return on investment was sufficient to make the purchase of Class E shares consistent with commercial considerations.

█ In the event that a subsidy is determined to have existed, we must also address the decision of the Court of International Trade to order Commerce to apply the standard "grant" methodology in deciding the amount of that subsidy. Commerce traditionally uses grant methodology to determine the amount of subsidy resulting from an infusion of capital into a company that is not equity-worthy. However, the Court of International Trade did not disturb Commerce's determination that FESILVEN was equity-worthy; instead the Court of International Trade focused on the Class E shares themselves. We conclude that it was legal error to impose the grant methodology on Commerce in this untested setting and that Commerce should be given the first opportunity to determine the appropriate method to apply in this area of its expertise.

### CONCLUSION

In light of the foregoing, we remand to the Court of International Trade for further proceedings not inconsistent with this opinion.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*