Slip Op. 11-46

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
ANDAMAN SEAFOOD CO., LTD. et al.          :
                                          :
          Plaintiffs,                     :
                                          :      Before:        WALLACH, Judge
     v.                                   :      Court No.:     08-00330
                                          :
UNITED STATES,                            :      **PUBLIC VERSION**
                                          :
          Defendant,                      :
                                          :
     and                                  :
                                          :
AD HOC SHRIMP TRADE ACTION                :
COMMITEE,                                 :
                                          :
          Defendant-Intervenor.           :
_____:

[Commerce's Final Results of Redetermination Pursuant to Court Remand are AFFIRMED.]

                              Dated:                April 26, 2011

White & Case LLP (Jay C. Campbell) for Plaintiffs Andaman Seafood Co., Ltd., Chanthaburi
Frozen Food Co., Ltd., Chanthaburi Seafoods Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana
Frozen Food Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd., Thai International
Seafoods Co., Ltd., and Rubicon Resources, LLC.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr.,
Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice
(Stephen C. Tosini) for Defendant United States.

Picard, Kentz & Rowe, LLP (Andrew W. Kentz and Nathaniel Maandig Rickard) for Defendant-
Intervenor Ad Hoc Shrimp Trade Action Committee.

**OPINION**

**Wallach, Judge:**

**I**
**INTRODUCTION**

This action comes before the court on the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand ("Remand Results"). Commerce issued these Remand Results after the court granted the request of Defendant United States ("Defendant") for remand of Certain Frozen Warmwater Shrimp From Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 50,933 (August 29, 2008) ("Final Results").[1]  During remand Commerce determined that Plaintiffs Andaman Seafood Co., Ltd., Chanthaburi Frozen Food Co., Ltd., Chanthaburi Seafoods Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana Frozen Food Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd, Thai International Seafoods Co., Ltd., and Rubicon Resources, LLC (collectively "Rubicon Group" or "Plaintiffs") should be granted a constructed export price ("CEP") offset.  Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("Ad Hoc" or "Defendant-Intervenor") now challenges Commerce's grant of a CEP offset to Plaintiffs. Defendant-Intervenor's Comments on Final Results of Redetermination Pursuant to Court Remand ("Defendant-Intervenor's Comments"); see Remand Results.  This court has jurisdiction pursuant 28 U.S.C. § 1581(c).  Commerce's redetermination is supported by substantial evidence and otherwise in accordance with law.

---

[1] Ad Hoc Shrimp Trade Action Comm. v. United States, 675 F. Supp. 2d 1287 (CIT 2009) (denying Ad Hoc's Motion for Judgment on the Agency Record, granting Defendant's request for a voluntary remand to revisit the Rubicon Group's entitlement to a constructed export price offset, and otherwise sustaining Commerce's determination).

2

## II
## BACKGROUND

In February 2007, Ad Hoc requested an antidumping review of sales in the United States by numerous Thai shrimp producers of certain frozen warmwater shrimp. Notice of Initiation of Administrative Reviews of the Antidumping Orders on Certain Frozen Warmwater Shrimp from Brazil, Ecuador, India and Thailand, 72 Fed. Reg. 17,100, 17,101 (April 6, 2007). Commerce in April 2007 initiated the review of an antidumping order covering 142 companies for the period of review from February 1, 2006 through January 31, 2007. Id. at 17,100-10. Commerce's selection of producers/exporters for review included the Rubicon Group. Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Preliminary Partial Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 12,088, 12,088-89 (March 6, 2008).

In August 2008, Commerce rendered its final determination for the administrative review of the subject antidumping duty order. Final Results, 73 Fed. Reg. 50,933. Commerce determined that the Rubicon Group was not entitled to a CEP offset. Memorandum from Stephen J. Claeys, Deputy Assistant Secretary for Import Administration, to David M. Spooner, Assistant Secretary for Import Administration, Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand – February 1, 2006, through January 31, 2007 (August 25, 2008) ("AD Memo"), Public Record ("PR") 512 at 12-17 (cmt. 5).[2]

Ad Hoc initiated the current litigation in September 2008, contesting numerous Commerce actions in the process that led to the Final Results. See Ad Hoc Shrimp Trade Action

---

[2] Citations to the Public Record refer to the administrative record filed in Plaintiffs' original challenge to the Final Results, not the record filed by Commerce concurrent with the Remand Results, unless otherwise noted.

Comm. v. United States, 675 F. Supp. 2d 1287, 1296 (CIT 2009). The Rubicon Group separately initiated litigation challenging the refusal of Commerce to grant a CEP offset. Id. In March 2009 the court granted Defendant's motion to consolidate these cases. Id. On December 29, 2009, the court denied Ad Hoc's Motion for Judgment on the Agency Record and granted Defendant's request for voluntary remand to address whether to grant a CEP offset to the Rubicon Group. Id. at 1312-13.[3] On April 29, 2010, the court granted Defendant's motion to sever the cases. April 29, 2010 Order (Doc. No. 29).

On May 7, 2010, Commerce issued its draft results of the redetermination, deciding that the Rubicon Group is entitled to a CEP offset for the review and recalculating the Rubicon Group's rate accordingly. Draft Results of Redetermination Pursuant to Court Remand ("Draft Results"). After receiving comments and rebuttal comments from both the Rubicon Group and Ad Hoc, Commerce issued its Remand Results determining that, upon reconsideration, the Rubicon Group is entitled to a CEP offset for the review and maintaining the same rate for the Rubicon Group that was recalculated for the Draft Results. Remand Results. Plaintiffs support Commerce's redetermination. See Plaintiffs' Comments on the United States Department of Commerce's Final Results of Redetermination on Remand ("Plaintiffs' Comments"). Defendant-Intervenor challenges Commerce's redetermination. See Defendant-Intervenor's Comments; Defendant-Intervenor's Reply Regarding Final Results of Redetermination Pursuant to Court Remand ("Defendant-Intervenor's Reply").

---

[3] For a more comprehensive overview of the underlying litigation, see Ad Hoc, 675 F. Supp. 2d at 1292-97.

# III
## STANDARD OF REVIEW

The court will hold unlawful a determination by Commerce resulting from an administrative review of an antidumping duty order if that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see 19 U.S.C. § 1516a(a)(2)(B)(iii).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support . . . a conclusion." Aimcor v. United States, 154 F.3d 1375, 1378 (Fed. Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966).

This inquiry must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). While contradictory evidence is considered, "the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record." Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S. Ct. 456, 95 L. Ed. 456 (1951)).

To determine whether Commerce's interpretation and application of an antidumping statute at issue is otherwise "in accordance with law," the court must conduct the two-step analysis articulated by the Supreme Court in <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). Under the first step of the <u>Chevron</u> analysis, the court must ascertain "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting <u>Chevron</u>, 467 U.S. at 842-43).

The court reaches the second step of the <u>Chevron</u> analysis only "if the statute is silent or ambiguous with respect to the specific issue." <u>Id.</u> (quoting <u>Chevron</u>, 467 U.S. at 843). Under this second step, the court must evaluate whether Commerce's interpretation "is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843. The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978). The court must defer to Commerce's reasonable interpretation of a statute even if it might have adopted another interpretation had the question first arisen in a judicial proceeding. <u>Id.</u> With regards to an agency's shift in policy:

> [I]f the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of <u>Chevron</u> is to leave the discretion provided by the ambiguities of a statute with the implementing agency. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations.

6

That is no doubt why in <u>Chevron</u> itself, this Court deferred to an
agency interpretation that was a recent reversal of agency policy.

<u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 981-82, 125 S. Ct.

2688, 162 L. Ed. 2d 820 (2005) (internal quotations and citations omitted).

**IV**
**DISCUSSION**

Defendant-Intervenor presents two issues in challenging Commerce's Remand Results.[4]

For the reasons stated below, (1) Commerce's grant of a CEP offset to Plaintiffs and (2)

Commerce's treatment of Plaintiffs' indirect selling expense ("ISE") ratios are supported by

substantial evidence and otherwise in accordance with law.

**A**
**Legal Framework**

Commerce is responsible for determining if goods are sold or likely to be sold at less than

fair value ("LTFV"), <u>i.e.</u>, if dumping is occurring. 19 U.S.C. §§ 1675(a), 1677(1), (34).

Antidumping duties are assessed if Commerce determines the normal value ("NV")[5] exceeds the

---

[4] The court is mindful that similar issues were considered in <u>Pakfood Pub. Co. v. United States</u>, 724 F. Supp. 2d 1327 (CIT 2010), which sustained the final results of Commerce's <u>third</u> administrative review concerning these parties and these issues.

[5] Normal value is the price charged for the subject merchandise in its home market, the price changed in an appropriate third country market, or the cost of production of the subject merchandise. 19 U.S.C. § 1677b(a)(1)(B)(i)-(ii), (a)(4).

7

export price ("EP")[6] or the constructed export price ("CEP");[7] if so, Commerce levies

antidumping duties in the amount of the difference between the two. 19 U.S.C. §§ 1675(a)(1),

1677(35)(A).  In order to compare fairly, Commerce is directed to account for certain differences

between the level of trade ("LOT") of foreign activities on which NV is based and the LOT of

U.S. transactions on which EP or CEP is based, provided that the difference in LOTs "has an

effect on price comparability." 19 C.F.R. § 351.412(b); see 19 U.S.C. § 1677b(a)(7)(A).[8]

A LOT adjustment is not available if "[d]espite the fact that a person has cooperated to

the best of its ability, the data available do not provide an appropriate basis to determine . . .

whether the difference in [LOT] affects price comparability." 19 C.F.R. § 351.412(f)(1)(iii).  In

this case, a CEP offset shall be granted if Commerce determines the NV is at a more advanced

LOT than the CEP. See 19 C.F.R. § 351.412(f); 19 U.S.C. § 1677b(a)(7)(B).

In order to receive a CEP offset, the foreign producer or exporter must supply evidence

that "the functions performed by the sellers at the same [LOT] in the U.S. and foreign markets

are similar, and that different selling activities are actually performed at the allegedly different

levels of trade." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.

---

[6] Export price "means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).

[7] Constructed export price "means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b).

[8] Commerce's regulations provide that "[t]he Secretary will determine that sales are made at different [LOTs] if they are made at different marketing stages (or their equivalent).  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.  Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." 19 C.F.R § 351.412(c)(2).

No. 103-316 (1994) ("SAA") at 829, reprinted in 1994 U.S.C.C.A.N. 4040, 4168.[9]  Commerce then must analyze "the selling functions to determine if [LOTs] identified by a party are meaningful[;] [i]n situations where some differences in selling activities are associated with different sales, whether that difference amounts to a difference in the [LOTs] [is] evaluated in the context of the seller's whole scheme of marketing." Pakfood Pub. Co. v. United States, 724 F. Supp. 2d 1327, 1339 (CIT 2010) (brackets in original) (quoting Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,371 (May 19, 1997)).  When a CEP offset is granted, the NV is "reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D) of this title." Alloy Piping Prods. v. United States, Slip Op. 2009-29, 2009 Ct. Intl. Trade LEXIS 21 at *15-16 (CIT Apr. 14, 2009) (quoting 19 U.S.C. § 1677b(a)(7)(B)).[10]

---

[9] The Uruguay Round Agreements Act approved the new World Trade Organization Agreement, and the agreements annexed thereto, "resulting from the Uruguay Round of multilateral trade negotiations [conducted] under the auspices of the General Agreement on Tariffs and Trade." 19 U.S.C. § 3511(a)(1).  The SAA, which was submitted to and approved by Congress, see 19 U.S.C. § 3511(a)(2), is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

[10] "Typically, the Department allocates indirect selling expenses by multiplying the price of each sale by the ratio of total indirect selling expenses to total sales revenue (the indirect selling expense ratio).  Nevertheless, the Department may accept other allocation methodologies provided they do not result in inaccuracies or distortions and are based on data which can be verified." Memorandum from Holly A. Kuga, Acting Deputy Assistant Secretary, Group II Import Administration, to Bernard T. Carreau, fulfilling the duties of Assistant Secretary for Import Administration, Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Stainless Steel Wire Rod from Spain - March 05, 1998 through August 31, 1999 at cmt. 2 (internal citations omitted), appended to Stainless Steel Wire Rod from Spain; Final Results of Antidumping Duty Administrative Review, 66 Fed. Reg. 10,988 (February 21, 2001).  For further discussion of CEP offsets, see Alloy Piping Prods. Inc. v. United States, Slip Op. 2009-29, 2009 Ct. Intl. Trade LEXIS 21, *13-16 (CIT Apr. 14, 2009); Pakfood, 724 F. Supp. at 1338-40.

**B**
**Commerce's Grant Of A CEP Offset To The Rubicon Group's NV Is Supported By**
**Substantial Evidence And Otherwise In Accordance With Law**

In its redetermination, Commerce concluded that it "did not fully take into account all of

the information on the record when [it was] conducting the administrative review of the 2006-

2007 period." Remand Results at 3.[11]  Unlike in the LTFV determination and in the original

proceedings in the second administrative review, in the redetermination Commerce found that

"there are substantial differences in the selling functions between sales to Canada and sales to the

United States, that it is reasonable to conclude that the sales to Canada were made at a more

advanced LOT than the CEP sales, and that a CEP offset adjustment to the Rubicon Group's NV

is appropriate." Id.[12]  Specifically, Commerce found:

> [O]n their sales to Canada, the Thai packers performed the
> following selling functions: sales forecasting; market research;
> sales promotion; advertising; participation in trade shows;
> inventory maintenance; order input/processing; freight and
> delivery arrangements; visits, calls and correspondence to
> customers; development of new packaging and new markets (with
> customer); packing; and after-sales services.

Id.[13]  In contrast, Commerce found that "[t]he only selling functions that the Thai packers

performed for CEP sales were inventory maintenance, order input/processing, freight and

---

[11] The Rubicon Group was not selected for individual examination in the first administrative review of this dumping determination. See Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 10,669, 10,670 (March 9, 2007).

[12] Commerce had previously "determined that the Rubicon Group's aggregate volume of home market sales of the foreign like product was insufficient to permit a proper comparison with U.S. sales of the subject merchandise. Therefore, [Commerce] used the Rubicon Group's sales to Canada as the basis for comparison-market sales." Remand Results at 2 n.2.

[13] "The following companies in the Rubicon Group produced subject merchandise during the [period of review] and are collectively referred to as the 'Thai packers': Andaman Seafood Co., Ltd., Chanthaburi Seafoods Co., Ltd., Chanthaburi Frozen Food Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana Frozen Food Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd., and Thai International Seafoods Co., Ltd." Remand Results at 3 n.3.

delivery arrangements, and packing." Id.

Commerce notes that it based its decision on answers provided by the Rubicon Group to Commerce's questionnaires and additional information provided by the Rubicon Group in the original proceedings in the second administrative review. See Remand Results at 4, 9 ("For example . . . the Rubicon Group's November 28, 2007, supplemental questionnaire response at Exhibits ABC-6 - ABC-11 contains numerous emails between certain Thai packers and their customers showing performance of various selling activities for the Thai packers' direct sales to Canada."). Commerce found that structurally the Thai packers would have had no need to and did not provide a high level of service for Rubicon Resources, an affiliated reseller located in the United States; Commerce states that "[a]ccording to the Thai packers, Rubicon Resources was required to purchase from [the Thai packers] because [Rubicon Resources] was created for the purpose of marketing and distributing their seafood products in the United States," i.e., Rubicon Resources was created to perform such work as "sales forecasting and market research." Id. at 4. Commerce also argues that "because the facts have changed since the LTFV investigation,[14] and the record contains adequate evidence that the selling activities are now substantially different, it is reasonable to draw a different conclusion in this remand redetermination." Id. at 9.[15]

Ad Hoc contests Commerce's finding that "the Thai packers performed significantly more selling functions for Canadian sales than they provided for CEP sales to the United States and . . . that these additional selling activities are significant." Defendant-Intervenor's Comments

---

[14] Commerce notes that "since the time of the LTFV investigation, Rubicon Resources began selling to Canada via its sales office located in the United States." Remand Results at 9.

[15] Note, however, that Commerce in the original proceedings in the second administrative review had characterized the evidence of the record differently, asserting that the Rubicon Group had "provided very little detail concerning the activities performed by the Thai packers for sales to Rubicon Resources and no evidence of these activities." AD Memo at 16 (cmt. 5).

11

at 2. Ad Hoc does not contest that "the Thai packers performed a high level of service for the Rubicon Group's direct sales to Canada" but does contest the sufficiency of the record as to the level of service provided by the Thai packers for Rubicon Resources relating to CEP sales in the United States. Id. at 3. Ad Hoc argues Commerce's conclusion in this regard is "not based on record evidence" and is in fact contradicted by the findings in the LTFV investigation. Id. at 3-7.[16]

Commerce's grant of a CEP offset to the Rubicon Group is supported by substantial evidence. Commerce determined that there was sufficient evidence in this record to conclude "there are substantial differences in the selling functions between the sales to Canada and sales to the United States" and that "the sales to Canada were made at a more advanced LOT than the CEP sales." Remand Results at 3; see 19 C.F.R. § 351.412(f).[17] Commerce based this determination on the answers provided by the Rubicon Group to Commerce's questionnaires,[18] a structural overview of Rubicon Resources, and changed circumstances since the LTFV

---

[16] In its comments to Commerce on the draft results of the redetermination, Ad Hoc summarizes its position, noting: "The Rubicon Group does not now point to evidence on the record previously overlooked by [Commerce] that demonstrates that the Thai packers did not continue to perform the same selling activities for CEP sales to Rubicon Resources as those found in the original [LTFV] investigation; instead, the respondent emphasizes the selling activities performed by Rubicon Resources and asserts that any evidence regarding such activities must also be construed as evidence that the Thai packers did not perform similar activities." Letter from Picard, Kentz & Rowe, LLP to Gary F. Locke, Secretary of Commerce, Remand Redetermination in the Second Administrative Review of the Antidumping Duty Order of Certain Frozen Warmwater Shrimp from Thailand: Rebuttal Comments Regarding Draft Results of Redetermination Pursuant to Court Remand (May 21, 2010), Remand PR 3 at 4.

[17] With regards to Ad Hoc's argument that Commerce "improperly reversed the burden imposed on the parties," Defendant-Intervenor's Reply at 4, Defendant correctly asserts that no such shift occurred; "[r]ather, Rubicon Group requested a constructed export price offset and provided evidence to support this request," Defendant's Response to Ad Hoc's Remand Comments ("Defendant's Response") at 6.

[18] Rubicon Group's responses to Commerce's questionnaires are record evidence that supports the determination. See ArcelorMittal USA Inc. v. United States, Slip Op. 2008-52, 2008 Ct. Intl. Trade LEXIS 62 at *37 (May 15, 2008) (holding that Commerce had sufficient information to determine a CEP offset was warranted and was reasonable in relying on "the extensive information [in the form of questionnaire responses] provided by defendant-intervenors concerning their selling functions in the Korean and United States markets.").

12

investigation. <u>See</u> Remand Results at 4, 9.[19]  The amount of information provided in this review

is in contrast to that provided in the LTFV investigation, where the Rubicon Group reported

almost identical selling functions for both Canadian sales and sales to the Rubicon Group's U.S.

affiliate. Memorandum from Barbara E. Tillman, Acting Deputy Assistant Secretary for Import

Administration, to James J. Jochum, Assistant Secretary for Import Administration, Issues and

Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned

Warmwater Shrimp from Thailand (December 23, 2004) ("LTFV Memo") at 20-21 (cmt. 5),

appended to Notice of Final Determination of Sales at Less Than Fair Value and Negative Final

Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From

Thailand, 69 Fed. Reg. 76,918 (December 23, 2004).[20]  Here, the Rubicon Group provided

sufficient information concerning its selling functions in the Canadian and United States markets

---

[19] This is similar to the information provided to Commerce in the third administrative review where, as here, Commerce determined to grant the Rubicon Group a CEP offset and where, as here, such grant was upheld by this court. <u>Pakfood</u>, 724 F. Supp. 2d at 1344-45 ("[R]elying on the [antidumping duty] statute and the SAA, and explaining that [Commerce's] LOT analysis involves a comparison of the respondent's selling functions for its various channels of distribution, [Commerce] concluded, on the record of the third review, that the Thai packers provided many more selling functions for Canadian sales than they provided for CEP sales, thus making the Canadian LOT more advanced than the CEP LOT.") (internal quotations omitted).

[20] Note, however, that in the LTFV investigation, Commerce "acknowledge[d]" the "Rubicon Group provide[d] sales forecasting/market  research for sales to Canada and direct U.S. sales, but not for sales to  its U.S. affiliate" but found this difference to be insignificant. LTFV Memo at 21.

for Commerce to grant a CEP offset based on the record before it.[21]

## C
## Commerce's Treatment Of The Rubicon Group's ISE Ratios Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Ad Hoc further contends that Commerce's grant of a CEP offset to the Rubicon Group in this review is not supported by substantial evidence because Commerce should have given more weight to the Rubicon Group's reported ISE ratios as part of the LOT analysis. See Defendant-Intervenor's Comments at 7-11. Ad Hoc argues that Commerce has "developed a practice of looking at objective criteria [i.e., ISE ratios] as a check on respondent's assertions," which Commerce did in the original LTFV investigation but did not do in this redetermination. Id. at 7, 10; see supra note 10.

Defendant replies there is no established practice for turning to selling expenses as part of a LOT analysis whereas there is an established practice for focusing on selling activities, and that while there are limited circumstances when Commerce does turn to ISE ratios as part of its analysis (such as in the original investigation in this case), here "Commerce was able to make a

---

[21] Defendant-Intervenor asserts that some of Commerce's conclusions about the Thai packers' selling activities are belied by previous conclusions made by Commerce in the LTFV investigation and in the original proceedings in the second administrative review. Defendant-Intervenor's Comments at 4 ("Commerce's acceptance of the Rubicon Group's assertions [concerning Thai packers' activities regarding CEP sales] contradicts the agency's findings in the Final Results."). Commerce determined that "there is no evidence on the record of the 2006-2007 administrative review that the Thai packers are providing [sales forecasting] to Rubicon Resources." Remand Results at 10. More generally, Defendant correctly points out that "Commerce relies only upon record evidence adduced during the relevant segment of proceedings." Defendant's Response at 6 (citing 19 U.S.C. § 1516a(b)(2); Allegheny Ludlum Corp. v. United States, 346 F.3d 1368 (Fed. Cir. 2003); erroneously citing USCIT R. 73.3 instead of USCIT R. 72.2); see also Pakfood, 724 F. Supp. 2d at 1343 (holding that the prior LTFV investigation and administrative review are not controlling and the question is "whether this determination was adequately explained and supported by substantial evidence on the record") (emphasis added). The record in this matter encompasses the remand proceedings as well as the original proceedings in the second administrative review; the court's inquiry focuses on "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." Huaiyin Foreign Trade Corp., 322 F.3d at 1374 (internal citations omitted). Commerce explained its reasoning for granting a CEP offset in this redetermination and not in the original LTFV investigation or the original proceedings in the second administrative review, noting overlooked information in the original proceedings in the second administrative review along with new information provided and changed circumstances since the LTFV investigation. See Remand Results 3-4.

14

determination based upon evidence of selling functions alone." Defendant's Response to Ad Hoc's Remand Comments ("Defendant's Response") at 6-9. Defendant also argues that ISE ratios in this case are not useful in that they were not reported on the same basis as the selling activities; therefore, "there would be no way to make a valid comparison." Id. at 8.

Defendant is correct that it was within Commerce's discretion to focus on selling activities, not expenses, in a LOT analysis; this focus is supported by statute and department practice and is affirmed by the court. See supra Part IV. A; 19 U.S.C. § 1677b(a)(7)(A) (directing Commerce to make a LOT adjustment "if the difference in [LOT]—(i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability") (emphasis added); SAA at 829 (defining "a difference in the level of trade" as "a difference between the actual functions performed by the sellers at the different levels of trade in the two markets . . ."); Remand Redetermination at 5 ("Although [Commerce] does in limited circumstances consider selling expenses in its LOT analysis, it does not consider them as a substitute for an analysis of the selling activities themselves.");[22] Pakfood, 724 F. Supp. 2d at 1347 n.41; Alloy Piping, 2009 Ct. Intl. Trade LEXIS 21 at *20 ("If Commerce, or this Court, in reviewing an administrative determination, were to narrow the focus of its LOT analysis to selling expenses, it could act contrary to law and cause misleading results. Expenses do not necessarily translate directly into

---

[22] In support, the Remand Redetermination cites Memorandum from Richard W. Moreland, Deputy Assistant Secretary, Import Administration, Group I, to Faryar Shirzad, Assistant Secretary for Import Administration, Issues and Decision Memo for the Antidumping Duty Investigation of Stainless Steel Bar from Italy, Final Determination at cmt. 37, appended to Notice of Final Determination of Sales at Less than Fair Value: Stainless Steel Bar from Italy, 67 Fed. Reg. 3,155 (January 23, 2002) and Memorandum from Stephen J. Claeys, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Ronald K. Lorentzen, Acting Assistant Secretary for Import Administration, Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan at cmt. 3, appended to Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Final Results and Final Rescission in Part of Antidumping Duty Administrative Review, 74 Fed. Reg. 1,174 (January 12, 2009).

activities, nor do they capture the intensity of the activities. Moreover, expenses related to several selling activities may fall under a single expense field.")). Additionally, Commerce is correct that "selling expenses do not translate directly into selling activities, nor do they always capture the degree to which the activities are performed." Remand Results at 5; see Defendant's Response at 7 (citing Alloy Piping, 2010 Ct. Intl. Trade LEXIS 21 at *20; Prodotti Alimentari Meridionali, S.R.L. v. United States, 26 CIT 749, 754 (2002);[23] SAA at 829; 19 U.S.C. § 1677b(a)(7)(A); 19 C.F.R. § 351.412(c)(2)).

Plaintiffs have failed to show that Commerce has an established practice of relying on ISE ratios. "Although the agency has in the past used a respondent's ISE ratios to corroborate its analysis of selling functions, there are numerous subsequent instances where [Commerce] has not considered a respondent's selling expenses as part of its LOT analysis at all, and [the petitioner] has not pointed the court to, and the court is not aware of, any precedent where, rather than corroborating [Commerce's] conclusions with regard to a respondent's selling functions, the respondent's expenses have been used to reverse those conclusions." Pakfood, 724 F Supp. 2d at 1347.[24] Additionally, Commerce has articulated in this redetermination why using the Rubicon Group's ISE ratios would be inappropriate. See Remand Results at 5; see also Defendant's

---

[23] The holding in Prodotti supports the holding here in that, for both cases, the petitioners did not adequately "explain[] how the [LOT] analysis adversely affected the margin." Prodotti, 26 CIT at 754. However, Prodotti does not stand for the position alleged by Defendant, i.e., that this case supports the position that indirect selling expenses should not be used in a LOT analysis. See Defendant's Response at 7 (stating that Prodotti "express[es] concern with purely quantitative analysis in determining whether level of trade differences exist"). The method criticized by the court in Prodotti is the same method adopted by Commerce in this case and urged as correct by Defendant, see id.; if anything, the dicta in Prodotti supports the use of indirect selling expenses. See Prodotti, 26 CIT at 754 (questioning "the usefulness of this quantitative analysis for any purpose," in reference to Commerce's comparison of selling activities without regard to expenses).

[24] Plaintiffs candidly stated in oral argument, with regards to Pakfood, that they "don't dispute the holding in that case . . . . The reasoning in that case points out that . . . [an ISE ratio analysis has] never been used to reverse a determination that's been made based on analysis of selling functions." March 17, 2011 Oral Argument at 11:06:00-11:06:14.

Response at 8 ("Specifically, Rubicon Group's selling activities were reported upon a market-specific and subject-specific basis, but most of the indirect selling expenses were allocated equally between sales to unaffiliated customers and sales to Rubicon Resources, because Rubicon Group could not find a practicable way to report them otherwise.").

Commerce was within its discretion to focus on selling activities to make its determination; therefore Commerce's treatment of the Rubicon Group's ISE ratios is supported by substantial evidence and in accordance with law.

## V
## CONCLUSION

For the above stated reasons, Commerce's redetermination in Final Results of Redetermination Pursuant to Court Remand is AFFIRMED.

__/s/ Evan J. Wallach____
Evan J. Wallach, Judge

Dated: April 26, 2011
New York, New York

17